Filed 6/5/17

## IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S076169 |
| v. | ) | |
| | ) | |
| GERALD PARKER, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Sup. Ct. No. 96-ZF-0039 |
| _____ | ) | |

Gerald Parker, nicknamed the "Bedroom Basher" by the media in the late 1970s for a string of unsolved home-invasion rape murders in Orange County, was convicted by a jury of the first degree murders of Sandra Fry, Kimberly Rawlins, Marolyn Carleton, Chantal Green, Debora Kennedy, and Debra Senior (Pen. Code §§ 187, subd. (a), 189)[1] with the special circumstances of multiple murder and murder during the attempted commission or commission of the crimes of rape and burglary (§ 190.2, subd. (a)(3), (17)(C), (G)).  The jury returned a verdict of death, and the court imposed judgment accordingly.  (§ 190.4, subd. (e).)  This appeal is automatic.  (§ 1239, subd. (b).)  We affirm the judgment in its entirety.

---

[1]    All further statutory references are to the Penal Code, unless otherwise noted.

**SEE CONCURRING AND DISSENTING OPINIONS**

1

## I.  FACTS

**A.      The Guilt Phase**

In 1978 and 1979, defendant was a staff sergeant in the United States Marine Corps stationed in Orange County, California.  During this time, six women in three different Orange County cities—Anaheim, Costa Mesa, and Tustin—were sexually assaulted and brutally beaten in their apartments.  Five died from massive injuries to their heads caused by being struck with a blunt object with such force their skulls were fractured.  One pregnant victim survived, but her fetus died as a result of the attack.  These crimes went unsolved until 1996, when deoxyribonucleic acid (DNA) testing connected the homicides to each other and to defendant, who was then in prison on an unrelated parole violation.  When interrogated and confronted with the DNA and fingerprint evidence during interviews the police tape-recorded with his knowledge, defendant admitted burglarizing all six homes.  At trial, he did not contest his identity as the assailant of all six women, but claimed he lacked the requisite specific intent to commit the crimes due to voluntary intoxication.

### 1.      The prosecution case

#### a)      *The victims*

##### (1)      *Sandra Fry*

On December 1, 1978, Georgena Stevenson returned home about 11:00 p.m. to the two-bedroom apartment she shared with 17-year-old Sandra Fry in Anaheim.  Stevenson found Fry in her bedroom lying unresponsive across the bed and nude from the waist down.  Her blouse was pulled up, exposing her bra, and there were obvious signs of trauma to her head, including blood around her mouth, nose, and hair.  Fry was not breathing, although she was warm to the

2

touch.  Paramedics transported her to the hospital, where she was pronounced dead.

Richard Fukumoto, M.D., the Chief Pathologist for the Orange County Coroner's Office, testified Fry died from subdural and subarachnoid hemorrhaging caused by cerebral lacerations and skull fractures from an unknown number of blows to her head by a blunt instrument, such as a baseball bat, two-by-four, or metal pipe.[2]  Dr. Fukumoto explained a "tremendous amount of force" is required to fracture the skull, and such an injury quickly causes loss of consciousness.  Fry also had a laceration on her lip, bruises and contusions over the bridge of her nose consistent with being struck in the face, bruises on her neck consistent with being choked, and bruising to her upper chest consistent with blunt force trauma.  The injuries to her face and neck were consistent with a struggle.  There were also signs of a struggle inside the apartment.

The point of entry into the apartment was a window above the bed in Stevenson's bedroom.  A latent fingerprint lifted from this window was later matched to defendant's left index finger.  Subsequent testing of the semen swabbed from Fry's body yielded a DNA profile that matched defendant's.

When he was interrogated in 1996, defendant described an attack matching Fry's case that occurred in Anaheim one evening in December 1978.  Defendant was driving around when he noticed an apartment complex near Buena Park. Parking on a narrow road behind the complex, he climbed a fence and entered through the back where the garages were located.  He passed three or four apartments before he reached one where he could see a woman sitting at the table

---

[2]     Robert Richards, M.D., performed Fry's autopsy but was unavailable to testify at the time of trial.  Dr. Fukumoto reviewed the autopsy report and photographs and testified regarding Fry's injuries and cause of death.

in the kitchen with her back to the living room window. He watched her for about a minute before going to the back of the apartment and entering through an open bedroom window. After watching the woman for several more minutes, defendant approached her from behind, intending to rape her. Before she became aware of his presence he hit her in the head two or three times with a two-by-four, rendering her unconscious.[3] He dragged her into her bedroom and laid her on the bed with her legs spread apart. He pulled his pants and underwear down before removing her pants, tearing off her underwear, and ejaculating on her. Before he left, defendant noticed the woman was having difficulty breathing. He did not take anything from the apartment and exited through the same window he had entered.

### (2) Kimberly Rawlins

On March 31, 1979, Roberta Birrittella and Donna Chavez went out on dates about 7:30 p.m., leaving Birrittella's roommate, 21-year-old Kimberly Rawlins, alone in their one-bedroom apartment in Costa Mesa. Chavez and her date returned about 11:30 p.m. to retrieve Chavez's identification. They spoke with Rawlins for a short time before leaving again sometime after midnight. Rawlins asked them to leave the door unlocked on their way out because she was going to take a shower and go to sleep and Birrittella did not have a key to the apartment.

Birrittella returned home about 4:45 a.m. on April 1. The front door of the apartment was ajar and all the lights inside were off except the one in the bathroom. Hearing what sounded like a heavy sigh or forced breath, Birrittella

---

[3]    As noted, there were signs of a struggle in the apartment and Fry suffered injuries consistent with a struggle, contradicting defendant's claim that Fry was unaware of his presence before he struck her in the head and rendered her unconscious.

4

went into the bedroom and found an unresponsive Rawlins wearing only an open bathrobe and lying half on and half off her bed. Rawlins's face was badly beaten; both her eyes were blackened and there was froth in her nostrils and swelling above both ears. Believing Rawlins to be dead and thinking the person responsible could still be inside their apartment, Birrittella fled to a neighbor's to call the police. Law enforcement officers who responded to the scene detected a faint pulse and began performing CPR on Rawlins. Paramedics arrived and continued CPR efforts, but soon after pronounced her dead.

Peter Yatar, M.D., performed Rawlins's autopsy. He testified Rawlins died from brain contusions with subdural hematoma as the result of multiple skull fractures—a nine-inch fracture extending from her left ear across the top of her skull, a three-inch fracture to her right temporal lobe, and a two and a half-inch fracture just over her right eye—consistent with applying "a great amount of force" with a blunt instrument. These injuries would have rendered Rawlins unconscious immediately. Dr. Yatar explained 400 to 600 pounds of force per square inch would be required to cause similar skull fractures on a cadaver, and even greater force would have been necessary to cause Rawlins's nine-inch fracture. Rawlins also had hemorrhages around both eyes, almost identical bruises on both sides of her head, and a small laceration on her lower lip that could have been caused by blunt force or as the result of falling on the floor. She also had two broken fingernails and small abrasions on two fingertips.

Subsequent testing of the semen found on the string of the tampon Rawlins had been wearing revealed a DNA profile that matched defendant's. It also matched the DNA profiles of the semen swabbed from Debora Kennedy and Debra Senior (see *post*).

When he was interrogated, defendant described an attack he committed one night in Costa Mesa that matched Rawlins's case. He was outside an apartment

5

window listening to three people inside talking. The man and one of the women left, leaving the other woman alone in the apartment. Defendant then drove around for about an hour before coming back. He entered the apartment through the unlocked front door with the intent "to go in and rape" the woman. The lights in the apartment were off. The woman was in the bedroom "sleeping in the nude." Defendant recalled she was short and petite and that he struck her two or three times with the two-by-four he was carrying. He could not recall whether he was able to achieve an erection. He said he left the apartment the same way he entered, throwing the two-by-four onto the garage roof.

### (3) *Marolyn Carleton*

On September 14, 1979, 31-year-old Marolyn Carleton and her nine-year-old son, Joseph, then known as Joey, were living in an apartment in Costa Mesa. About 11:45 p.m., the complex's manager, who lived next door, walked by and noticed Carleton's patio sliding glass door and drapes were open but the screen door was closed. The light was on in the dining area and the manager could see Carleton, who appeared to be asleep on the floor.

Shortly before 3:00 a.m. on September 15, a law enforcement officer was dispatched to Carleton's apartment.[4] The patio's sliding glass and screen doors were now open but the drapes were closed. Joey met the officer outside, saying his mother had been hurt; he directed the officer inside, where the apartment was dark except for a hallway light. Carleton was found lying on the master bedroom floor, partially propped up against the bed and nightstand. She had a very weak

---

[4] During victim impact testimony in the penalty phase, Joseph testified how his mother, screaming his name, woke him in the middle of the night. After finding her incoherent and bleeding on the floor of her bedroom, he called the operator for assistance.

pulse, was struggling to breathe, and appeared to be unconscious. Her face and hair were covered with blood and there was a large wound on the top of her skull. The short nightgown she was wearing had been pulled up above her waist and her underwear was down around her right leg between her knee and ankle. Paramedics transported Carleton to the hospital, where she died the next day.

Dr. Fukumoto testified Carleton died from subarachnoid and subdural hemorrhage and cerebral contusions as a result of blunt force trauma.[5] She had a "massive" scalp laceration above the left earlobe that extended back to the base of the skull. Beneath this was a depressed skull fracture that was "quite extensive" and had lacerated the brain tissue. A "large amount of force" from a blunt instrument was required to inflict these injuries. Carleton also had areas of bleeding around her left eye and in her right anterior shin, medial calf, and thigh, but no defensive-type wounds. A rape kit taken from Carleton after her admission to the hospital yielded insufficient biological evidence for any type of testing or analysis.

During his interrogation, defendant was asked if he remembered attacking a woman where "her little boy was home." Defendant replied, "Oh yeah. Geez, how did I forget that one? . . . I didn't know the little boy was in there, until it was too late . . . ." Defendant described scaling a back wall and entering Carleton's apartment through an unlocked sliding glass door. Carleton was asleep in her bed with a nightlight on. She was wearing a nightgown but no underwear. Defendant hit her in the head three or four times with the intention of knocking her unconscious so he could rape her. He did not recall what he used but said "in most

---

[5]     Walter Fischer, M.D., performed Carleton's autopsy. He was deceased at the time of trial. Dr. Fukumoto reviewed the autopsy report and photographs and testified regarding Carleton's injuries and cause of death.

cases, it was [two-by-fours] . . . these things were laying all over the place at that time . . . ." He attempted to sexually assault her but could not recall if he got an erection or ejaculated. Defendant said when he exited the bedroom, he "bumped into" the boy in the dark hallway and the boy asked, "[W]hat's wrong with mommy." Defendant did not say anything, moved the boy aside, and left the apartment the same way he entered.

### *(4) Chantal Green*

On September 30, 1979, 20-year-old D. Green was nine months pregnant and living in an apartment in Tustin with her husband who was in the Marines. At 2:15 a.m., a law enforcement officer responded to a call from the apartment and was met outside by the husband, who appeared to be in a state of shock and said his wife had been injured. D. was in the bedroom, unconscious and lying on the bed nude with her legs spread apart. She was having difficulty breathing and was bleeding from a two-inch hole in the middle of her forehead, as well as from her ear and nose. There was blood on the bed and floor, and blood spatter on the wall behind the bed. The wound to her head was so deep it exposed brain tissue and was so pronounced the officer initially believed she had been shot. D. was transported to the hospital. Several hours later her unborn fetus, Chantal, ceased to have vital signs and was delivered stillborn.

Dr. Fukumoto performed Chantal's autopsy and testified regarding her cause of death as well as D.'s injuries. The wound to D.'s head had been caused by blunt force consistent with being hit by a mallet or the end of a baseball bat. This would have rendered her unconscious immediately and caused severe underlying damage to her brain. Shock from this traumatic injury caused D.'s body to shift the oxygenated blood to her heart, lungs and brain, resulting in her

uterus receiving less oxygenated blood. Chantal died from intrauterine anoxia caused by the marked decrease in the oxygenation of her mother's blood.

D. spent 10 days in a coma and remained in the hospital for about three weeks. When she regained consciousness, she had total amnesia and could not remember anyone. She had to learn to talk and spell all over again, a process that took years. D. eventually regained her memory but at the time of defendant's trial, some 17 years later, she still had problems communicating, particularly if someone talked fast or the subject matter was technical.

D.'s husband was convicted of the second degree murder of Chantal and of attempting to murder his wife and assaulting her with force likely to cause great bodily injury. He was committed to prison in November 1980 for a term of 15 years to life. Subsequent testing of the sperm on the vaginal swab from D.'s rape kit taken revealed a DNA profile that matched defendant's. In June 1996, D.'s husband was released from custody after an Orange County Superior Court judge set aside his convictions and dismissed the case against him.

When interrogated, defendant admitted he was the one who attacked D.. He said he was drunk and it was around midnight when he drove up and parked his black van close to her apartment complex. While walking around the complex, he overheard D. and her husband arguing, heard a car start up, and then saw the husband drive away. Defendant left for about an hour, drank some more alcohol, then came back and entered the apartment through the unlocked front door. He saw memorabilia in the living room indicating the husband was in the Marines. D., who was noticeably pregnant, was lying on the bed in the bedroom. Defendant rushed toward her and hit her in the head with a board he had picked up outside the apartment. After knocking her unconscious, he raped her and ejaculated inside her. Defendant denied taking anything from the apartment, asserting that "[i]n no

9

case . . . was a robbery involved . . . these were all cases of rape and then out of the house."

### (5)     *Debora Kennedy*

On October 6, 1979, Yvette Levay and a friend left for Las Vegas about 9:00 p.m.  Levay's sister, 24-year-old Debora Kennedy, stayed home alone in their apartment in Tustin. When Levay returned to the apartment the next day about 6:00 p.m., the front door was open and Kennedy was lying in an exaggerated spread-eagle position on a blood-soaked mattress on the floor of her bedroom. She had massive blunt force trauma to her face and showed no signs of life.  Her body was covered with a knitted shawl and there was blood spatter on a nearby credenza.  She was unclothed except for a robe and there was a mucous-like substance between her legs in the vaginal area.

Dr. Fukumoto testified Kennedy died from cerebral laceration with subdural and subarachnoid hemorrhaging caused by blunt force trauma to the head with resulting skull fractures.[6]  The extensive fracturing of her skull started above the right earlobe (the point of impact) and radiated down to the base and the opposite side of the skull.  This injury would have required at least five blows from a blunt instrument—such as a baseball bat, two-by-four, pipe, or the flat end of a hammer—delivered with a large amount of force.  Kennedy also sustained multiple injuries to both sides of her face and periorbital hemorrhage to her eyes, but no defensive wounds.

There were no signs of forced entry to, or struggle inside, the apartment, but a window in a back rear bedroom had been opened and its screen removed.

---

[6]     Dr. Richards performed Kennedy's autopsy but, as noted (fn. 2, *ante*), was unable to testify at trial.  Dr. Fukumoto reviewed the autopsy reports and photographs and testified regarding Kennedy's injuries and cause of death.

Subsequent testing of the sperm swabbed from Kennedy's body revealed a DNA profile that matched defendant's.

When he was interrogated, defendant described the attack on Kennedy as occurring late at night or during the early morning hours. He said he took a mallet he found in the back of a pickup truck parked close by and entered Kennedy's apartment through a window that was cracked open. When he entered the living room Kennedy was asleep on the floor leaning against the couch with the television on. She had a blanket over her but defendant claimed she was not wearing any clothes. He hit her on the head with the mallet, raped her, and ejaculated inside her. He recalled Kennedy was "kind of heavy" and said there was "no particular reason" for selecting her single-story apartment.

### (6)    *Debra Senior*

On October 20, 1979, Debra Chamberlain and 17-year-old Debra Senior went together to a party in Fountain Valley, California. About 10:30 p.m., Senior left in Chamberlain's car to return home alone to their apartment in Costa Mesa. Chamberlain later got a ride home with a friend, arriving about 2:30 a.m. The lights in the apartment were on and the stereo was playing. Chamberlain found Senior lying on the floor of her bedroom near the foot of the bed, unclothed except for a pair of socks. She had suffered severe head trauma and her hair was matted with blood. Blood spatter extended from her left shoulder, elbow, and forearm onto the foot of the bed. A torn blouse and unsnapped bra had been pulled up around her shoulders. Buttons from the blouse were found on the floor next to her body. A green towel had been partially wrapped around her neck. Torn underwear was lying on a pair of shoes near the bed and the contents of a purse were on the floor near her feet.

11

Dr. Fukumoto testified Senior died as a result of a hemorrhage from a cerebral laceration and contusions caused by blunt force trauma with skull fractures.[7] A skull fracture associated with two elongated lacerations on the right side of her head radiated downward to the base and around to the left side of her skull. Fragments from the fracture had lacerated her brain. A pipe, two-by-four, or baseball bat could have inflicted these injuries, which would have required more than one blow with a "large amount of force" and would have rendered Senior unconscious almost immediately. Blood spatter at the crime scene was consistent with Senior's not having moved after being struck on the right side of the head while lying on the bed. Autopsy photographs showed the head injuries suffered by Senior and Kennedy were both slightly curved lacerations, leading Dr. Fukumoto to suspect the same blunt instrument had been used in both cases.

The point of entry into the apartment was a bathroom window; there were partial shoe prints on top of a gas meter outside the window and on a bar of soap on the floor of the bathtub directly under the window. One of the handprints lifted from the windowsill matched defendant's left palm. Subsequent testing of the sperm swabbed from Senior's body revealed a DNA profile that matched defendant's. As noted, it also matched the DNA profiles of the semen swabbed from Rawlins and Kennedy.

During defendant's interrogation, a detective described the area where Senior's apartment had been located, prompting defendant to recall, "I know, I gotcha . . . this one was young . . . 17, 18, something like that." He described parking a "considerable distance" from Senior's apartment and pretending to be a

---

[7]     Dr. Fischer performed Senior's autopsy but, as noted (fn. 2, *ante*), died before the trial. Dr. Fukumoto reviewed the autopsy report and photographs and testified regarding Senior's injuries and cause of death.

jogger in the neighborhood while he looked in windows. He saw Senior's apartment was empty and entered through a bathroom window. He had been there for about 20 minutes when Senior came home. Hiding in the bathroom, he watched Senior make a drink in the kitchen, sit down on a couch in the living room, and eventually fall asleep. Defendant exited the bathroom and hit Senior in the head two or three times with a two-by-four, rendering her unconscious. He then carried her into one of the bedrooms, laid her on the floor, removed her underwear, raped her, and ejaculated inside her.

### b) *Defendant's interrogations and statements*

#### (1) *Avenal State Prison*

In June 1996, Costa Mesa Police Department Detective William Redmond obtained some of the DNA test results linking defendant to the above homicides. On June 14, Redmond, investigator Lynda Giesler, and Tustin Police Department investigator Thomas Tarpley drove to Avenal State Prison in Kings County to serve a search warrant on defendant and to interrogate him. About 10:30 a.m., Redmond, Giesler, and defendant were placed in one of the prison's interview rooms.[8]

After advising defendant of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), Redmond explained that a blood sample taken when defendant was last released from prison had been run through a computer database and defendant's DNA "came up on a couple of Costa Mesa homicides back in 1979." Defendant said he had been through Costa Mesa but never lived there and did not recall the area well. From 1975 to 1978, he had been stationed at the Marine base

---

[8] All of defendant's interrogations were audio- or video-recorded. These recordings were played for the jury and transcripts of the recordings were provided to jurors.

13

in Tustin, where he was assigned to a helicopter squadron and typically worked the night shift from 4:30 p.m. until 8:00 a.m. on weekdays. Toward the end of his career in the Marines, he was transferred from Tustin to El Toro, where he spent just a few months. Defendant described his lifestyle at this time as revolving around drinking and using drugs. He drank "anything I could get my hands on," smoked marijuana for a number of years, did PCP and as much LSD as he could, and used cocaine and heroin for about three months. His only close friend was another Marine, Albert Garcia, with whom he shared an apartment in 1975 and early 1976 and often socialized.

Defendant briefly described his family and upbringing, and said he had "always had problems" meeting women and never developed relationships with them. He claimed he did not keep track of Orange County news and did not recall hearing in 1979 about women in Costa Mesa being sexually assaulted and murdered. When Giesler reiterated that defendant's DNA matched that found on four victims, he responded, "I don't know what to tell you." Redmond clarified that the DNA was obtained from semen and the victims had been hit on the head and raped. He asked if defendant had ever experienced violent tendencies on PCP or if it was possible he had "met a girl, saw a girl, followed a girl home, and then, whatever happened happened?" Defendant did not think he "could forget something like that." Giesler encouraged him to confess and "[g]et the monkey off your back," but defendant said "the day is not today" and "I think I should wait until later on . . . . I just need some time to . . . to draw upon some strength. . . . To say what I have to say." He told Redmond and Giesler to come back after he was transferred to Orange County jail in 23 days. Giesler agreed, but said another investigator from Tustin had come with them and wanted to talk to him.

Redmond and Giesler left the interview room, at which time Tarpley entered. Tarpley readvised defendant of his *Miranda* rights and defendant agreed

14

to talk to him "about why I'm here today." At 12:09 p.m., Tarpley began to interrogate defendant. He explained he was investigating a 1979 Tustin homicide and asked where defendant had been living at that time. Defendant said he was staying at the Marine Corps Air Station in El Toro and recounted much of the background and personal history he had given to Redmond and Giesler.

Tarpley showed defendant a picture of Debora Kennedy. Defendant said he had never seen Kennedy before and did not know why his semen would be in her, saying, "I find it hard to believe that it matched four and here's a fifth. I have no idea. . . . None whatsoever." Tarpley also described the Green case. Defendant recalled reading there had been an argument and the husband, who was a Marine, hit the victim in the head. He asked if the husband was on death row. Tarpley said the husband had been convicted but that he did not know if he was on death row. Defendant admitted it was "possible" he had killed someone while under the influence of drugs because sometimes he "blacke[d] out" and would do and say things he did not remember. Tarpley urged defendant, "Today's the day that you take control and you say . . . I'm going to do the right thing, and that's what we're here for . . . . And that's what I'm asking you to do. . . . Can you do that for me?" In response, defendant asked, "Is Costa Mesa still here?" Tarpley replied affirmatively. Defendant asked to use the bathroom, stating, "then we can . . . get this over with."

Detective Redmond and investigator Giesler joined Tarpley in the interview room at 1:05 p.m. and defendant proceeded to confess to the homicides at issue. He began with the case of "the Marine and his wife," saying: "I believe that there is a man on death row because of something that I did [and] out of all these murders and the crimes that I committed over the years, that was the one that bothered me the most . . . ." Defendant had heard about the attack on the radio and read about it in the newspaper in 1980 or 1981, but claimed his memory was hazy

15

due to drinking and drugs.  In general he used to get drunk at bars and then drive around looking for a prostitute or woman—"that's where this started, you know, looking through windows or hoping that you find a door open, that sort of thing . . . ."

Defendant described the attack on D. Green as detailed above.  He claimed he "couldn't even get an erection . . . in most of these cases, because I was drunk and under the influence of drugs. . . ."  Tarpley asked, "[H]ow many women do you think . . . you attacked?"  Defendant was not sure; "I didn't know these people were actually dying, until I heard it . . . on the radio."  He could not recall his first attack, but denied attacking any women in other states where he had been stationed.

Defendant also described the attacks on Debora Kennedy, Kimberly Rawlins, Marolyn Carleton, Debra Senior, and Sandra Fry as detailed above.  He reiterated he did not take anything from the apartments and never went through drawers or closets because he was not in the homes long enough.  He never wore gloves and did not wash anything or wipe anything clean when he left.  He read a couple of articles about the incidents while incarcerated and heard things on the radio, but had not known the full extent of what had happened until now.  Sometimes the day after an attack he would recall he had gone "out," but other times he experienced "a total blackout" and would not recall what had happened until later.  Defendant never told anyone about the attacks, although he thought about them.  Two or three years before, he had gone through a drug rehabilitation program and left thinking, "[T]hat's probably what I've been doing all these years is trying not to face . . . what I'm facing now and I'm trying to stay away from it, because . . . I don't know how to handle it . . . ."  Defendant could not recall any other cases and said he only remembered the last three or four he described by

16

"shaking my memory." At the conclusion of the interrogation, defendant's blood was drawn pursuant to the search warrant.

### (2) California State Prison Corcoran

About 10:30 p.m. the same day, Anaheim Police Department Detective Richard Raulston and Sergeant Steven Rodig interrogated defendant, who meanwhile had been moved to California State Prison Corcoran, regarding Fry's case. Raulston inadvertently erased a portion of the tape recording while trying to duplicate it, so he returned to the prison on June 16, 1996. There, he readvised defendant of his *Miranda* rights, and defendant repeated much of what he had previously confessed regarding Fry's death, adding more details.

On June 18, 1996, Redmond and Giesler went with their supervisor and a technician to interrogate defendant on videotape. Defendant again was advised of his *Miranda* rights and again agreed to speak to investigators. He provided a lot of the same and some additional information regarding his background and the crimes. Defendant said he began using LSD and mescaline in junior high school in San Diego. After basic training, he was stationed in Adak, Alaska, where he first tried alcohol. He drank every day, including when he was on duty. His drinking and drug use reached the point he was not reporting to work, and by mid-1979 he was about to be kicked out of the military.

Regarding the crimes, defendant claimed his intent had been only to knock the women unconscious so he could rape them. It never occurred to him he was killing the women because once in a fight he had knocked his opponent out by hitting him in the head with a two-by-four and, although there had been a small amount of blood, this did not kill the man. Defendant thought everyone's skull could withstand the same amount of force and hitting the women in the head only rendered them unconscious. He first thought about assaulting women shortly

17

before the first assault.  Later, when he was in prison, he thought the cases were so old the victims might have passed away or there might have been insufficient evidence to identify the assailant.

## 2. The defense case

Defendant presented no evidence during the guilt phase and engaged in limited cross-examination of the prosecution's witnesses.  In opening and closing argument, the defense conceded identity, but relied on defendant's statements to argue he was guilty of only second degree murder as to each victim based on diminished capacity due to intoxication.

## B. The Penalty Phase

At the penalty phase, the prosecution relied on the facts and circumstances of the murders, including the impact on the victims' families, and introduced evidence regarding several additional acts of violence.  Defendant testified on his own behalf and presented the testimony of a friend from his time in the Marine Corps and the expert opinion of a forensic psychiatrist.

### 1. The prosecution's case-in-aggravation

#### a) *Other acts of violence*

##### (1) *1979 rape*

On July 19, 1979, Jane D. was living alone in a Costa Mesa apartment.  She went to bed between 11:00 and 11:30 p.m., but was later awakened by noises in the hallway.  When she went to investigate, a man grabbed her and told her to shut up, after which she lost consciousness.  During this brief encounter, Jane did not notice any signs of his being intoxicated.  A friend coming to see her the next morning found the apartment's front door open a few inches and Jane lying unconscious in bed on her back.  Her eyes were swollen and there were scratches on her face and bruising behind her ear.  She looked like "a prize fighter after a

18

fight." Her pillow was covered in blood, and blood was splattered on the bedroom wall and heater. Jane was taken to the hospital, where she remained in a coma for about four weeks. She suffered an "ear to ear" skull fracture and required a permanent tracheostomy as a result of having been strangled. At the time of defendant's trial she could not breathe well and could not swim or engage in heavy exercise. As a result of permanent nerve damage, she also had problems chewing and difficulty forming words.

DNA extracted from sperm from the vaginal swabs from Jane's rape kit matched defendant's profile. When he was interrogated in prison in June 1996 defendant confessed to assaulting Jane.[9] He said he had been drinking that night and entered the apartment through an open dining room window. He found Jane sleeping in the nude and hit her in the head with a two-by-four, which he later discarded in a dumpster. He believed he was unable to obtain an erection and that he ejaculated without penetrating her. Defendant admitted he entered the apartment to see if there was a female inside and, if so, to knock her unconscious and rape her.

### (2) 1980 robbery

On February 2, 1980, defendant was visiting his brother, who lived in Pasadena, California. Around 10:00 p.m., Aida Demirjian arrived at the Pasadena apartment complex where she lived and was locking her car in the underground parking structure when defendant hit her two or three times in the head with an iron rod. She fell down and pretended to be unconscious, but defendant kept hitting her. She got up and started to run and yell for help but he ran after her,

---

[9]     Tape recordings of the relevant portions of the interrogations were played for the jury during the penalty phase and transcripts of the recording were provided to jurors.

grabbed her, and hit her again. Demirjian fell a second time and again pretended to be unconscious as defendant dragged her a few feet, ripped a necklace from her neck, and looked through her purse. When he subsequently lifted up her skirt, she got up and ran to the manager's apartment for help. Demirjian was hospitalized for several days and required surgery and physical therapy to repair a skull fracture and several broken fingers.

A law enforcement officer was dispatched to the scene around 10:20 p.m. About a half-block from Demirjian's complex, defendant crossed the street in front of the officer's marked police car. The knees of defendant's pants were scuffed and appeared stained. When the officer exited the car and approached defendant, he noticed blood on defendant's pants, shirt, and hands. Defendant was calm, cooperative, and compliant, and did not appear intoxicated when he was detained and taken into custody. Another officer found a bloody metal pipe on the floor of the parking structure, as well as a gold and pearl necklace. A certified copy of defendant's October 1980 conviction, pursuant to his guilty plea, for robbery and infliction of great bodily injury during the commission of a robbery, was introduced as evidence.

### (3)     1980 rape

On February 15, 1980, 13-year-old Paula S. attended her father's funeral. About 3:30 p.m., she was walking home from a drug store in Tustin when a black van drove past her and pulled over. Defendant got out and went around to the back of the van as though he were checking the tire. As Paula walked by the van, he grabbed her by the sweater, punched her in the face, threw her into the van, and drove off. While driving, defendant kept looking at Paula through the rearview mirror, saying, "[S]tay down, stay down, or I'll kill you." He later stopped in the parking lot of a small shopping center, got in the back of the van, and raped her.

20

Afterward, he asked Paula personal questions, such as what her name was and how old she was. When it was dark, he drove close to where she lived and dropped her off in an alley, saying, "If you tell anybody, I'll come back and I'll kill you." When she got home, Paula told her mother what had happened and the police were called. Defendant confessed to the attack when interrogated a few days later. When interrogated in prison in June 1996, he also talked about "a rape he had been convicted of" and said it probably saved the girl's life that she was so young. The prosecution introduced a certified copy of defendant's May 1980 conviction, pursuant to his guilty plea, for kidnapping and rape by threat.

### (4)    1984 assault

On the night of February 13, 1984, David Feurtadot was sharing a room with defendant at the state prison in Tehachapi, California, and was asleep when defendant began hitting him in the back of the head with a curved piece of steel approximately two feet in length. Feurtadot chased defendant out of the room and into the hallway, but had to sit down because he was bleeding profusely; he almost passed out from the pain. The three- to four-inch cut on his head required stitches and he stayed in the hospital facility for a week. Defendant never said why he attacked him, and Feurtadot did not know the reason. At the time of defendant's trial, Feurtadot still suffered headaches as a result of the incident. The prosecution introduced a certified copy of defendant's June 1984 conviction, pursuant to his guilty plea, for assault with a deadly weapon.

### b)    Victim impact evidence

Judith Brown testified about the loss of her younger sister, Sandra Fry. Fry was one of 10 siblings. Brown described her as very compassionate and loving, the kind of person who would bring home stray animals. Fry had moved out of the family home just three days before she was murdered. Her death devastated

21

the family; the last time they all got together was her funeral. Brown was pregnant at the time of Fry's murder and her son grew up fearful because Brown was so overprotective and afraid of losing him. When he graduated from high school, she bought him a truck to take to the University of Nevada, Las Vegas, but he would not go. At the time of defendant's trial, Brown seldom left her house.

Cheryl Rawlins testified about the loss of her younger sister, Kimberly Rawlins. Kimberly had just moved out of the apartment they shared when she was murdered. Cheryl described Kimberly as her best friend and a very happy and giving person who had wanted to have many children. Their plan had been for Kimberly to help Cheryl through her first two years of college, and then Cheryl would help Kimberly with her first two years of college. The family initially could not afford a grave marker, and when one of their brothers went to the cemetery and could not find Kimberly's grave, he became distraught and began drinking heavily after having been sober for quite some time. At the time of defendant's trial, the family was unsure of this brother's whereabouts.

Joseph Lee testified regarding the night he was nine years old and awakened by his mother, Marolyn Carleton, screaming his name. He was at her bedroom door when it opened and a dark-skinned man pushed past him, ran down the hallway, and left the apartment. Inside the bedroom, Joseph turned on the light and found his mother lying on the floor propped against her nightstand, incoherent and bleeding. When he realized he could not stop the bleeding, he called the operator for assistance. Joseph described his mother as "everything a young boy like myself at the time would want in a mother. She cared, protected, guided, put me before herself, and loved me like only a mother could. [¶] She was everything to me. She was my friend, my teacher, my life . . . . [¶] When she died that early morning, part of me died. That can never be replaced." Carleton's sister, Mary Lee, testified about losing Carleton to a "cruel and senseless act of violence." She

22

read a poem by their mother, who had died of cancer the year before defendant's trial, about the loss of Carleton.

Sandra Kennedy testified regarding the loss of her aunt, Debora Kennedy, who was just two years older than she and "like a sister." Sandra lived near Debora and they spent their summers together. She described Debora as a very giving, sensitive, and creative person who had a lot of potential and would "give you the shirt off of her back." After Debora's murder, Sandra worried for a long time that someone had a vendetta against the family and was constantly "looking over her shoulder." Out of concern for Debora's grandmother, who suffered a stroke shortly after the murder, the family of eight siblings, although devastated, "chose not to talk about it a whole lot."

Jackie Bissonnette testified regarding the close bond she had with her sister, Debra Senior, who had been the youngest of four children. Although only 17 years old when she was murdered, Debra had already graduated from high school, was working full-time, and lived on her own. She had been planning to move back home in order to continue her education at Orange Coast College. Bissonnette recalled "her smile, her laugh, and her kindness" and said "Debbie's death left a void in my life that 19 years later is still there. Not a day goes by without Debbie being in my thoughts. There's no special occasion, no happiness, without the void of Debbie's absence felt." She read a statement for their mother relating the belief Senior's father had died of a broken heart three years after her murder, and she read two poems written by Debra.

### 2. The defense case-in-mitigation

Albert Garcia testified he met defendant in 1973 when they were both in the Marine Corps stationed in Adak, Alaska. They were roommates from 1974 to 1977 in Tustin and "partied" together on the weekends, drinking alcohol and

23

sometimes smoking marijuana and PCP. Garcia described defendant as intelligent, quiet, mellow, very respectable, and a model marine who was promoted to staff sergeant in five years. He said he never saw defendant get into a fight and thought defendant had good control over his temper. He did not believe defendant had an alcohol problem and he had never seen defendant behave violently after using alcohol or drugs. After they grew apart, Garcia was "surprised" when he learned defendant had been convicted of rape in 1980 and again when he heard about this case.

Defendant testified on his own behalf. He spoke of being prescribed psychotropic medications for the first time in 1984 while incarcerated. They made him "calm" so he was not "out of control or nervous" around people. There was an eight-year period after he was released from prison that he stopped taking the medications, but he had been taking them continuously since returning. He was not on medication when he attacked his cellmate, who he claimed was stealing from him. On cross-examination, defendant admitted that while incarcerated and taking medications to control aggression and psychotic symptoms, he had on separate occasions said he was (1) "out of control" and had "no doubt I could murder someone," (2) staying in his cell because he felt like hurting people, and (3) fearful of losing control in court and becoming violent. After the latter two occasions, which occurred while he was awaiting trial in this case, his medications were changed and the violent feelings went away.

Defendant also expressed remorse for the crimes, saying, "I know that I have caused the families and the friends of the victims quite a bit of pain throughout the course of the last 19, 20 years, and I accept full responsibility for that. I am truly, truly sorry for the crimes that I have committed and the reasons why we are all here today in this courtroom. If there was anything that I could do to take away the pain and the sorrow of the families of the victims, I would. And

24

if my life is what it takes for them to feel that their family members have been vindicated, then that is what I believe should be done . . . ." On cross-examination, however, after saying he had "always" felt sorry for what he had done, defendant admitted that after killing Fry he "went about business as usual." He said the crimes were for "sexual gratification" but claimed he did not get any from them. He conceded that whatever remorse he felt at the time of an attack did not prevent him from attacking additional victims, and that he made the decision to "rape and kill" of his "own free will." Defendant denied he "liked killing women" but admitted he knew what he was doing and that it was wrong. He agreed that if he had not been arrested after raping Paula S., he would have continued "raping and murdering." He also admitted he had been in and out of custody since 1987 and had been arrested in November 1988 in Garden Grove, California, for attempting to force a woman to orally copulate him while he was armed with a knife, for which he was reimprisoned.

Lastly, Forensic Psychiatrist Paul Blair, M.D., testified regarding his conclusions following his examination of defendant's mental status. Dr. Blair's assessment was based on two personal interviews, totaling about three hours, conducted in October 1998, on a review of defendant's interviews with police, and a review of the Orange County Jail psychiatric team's notes on defendant from June 1996 to October 1998. Dr. Blair's findings were consistent with the psychiatric team's diagnosis of organic mental syndrome, unspecified psychotic disorder, chronic alcohol abuse (in institutional remission), and major depression.

According to Dr. Blair, defendant was cooperative throughout the evaluation. He self-reported experiencing non command auditory hallucinations, specifically the voices of a male and a female psychiatrist. At times the female voice seemed to be his grandmother. Defendant "could not recognize what the voices were telling him," but said he did not commit the crimes because voices

25

told him to. He also had the delusions that people he did not know were talking about him and that thoughts could be physically inserted into, as well as removed from, his head.

Dr. Blair explained defendant's formal psychiatric history began 14 years earlier. Defendant was treated at Vacaville State Prison without medication and then at the California Institution for Men in Chino with antipsychotic medication. During his pretrial confinement in the Orange County Jail, he had been on several antipsychotic medications to control aggression, confusion, disorganized thinking, anxiety, and depression, and to reduce if not eliminate psychosis.

Defendant self-reported his history of drug and alcohol use, claiming he regularly inhaled glue, paint, and paint thinner between the ages of seven and 15, began using marijuana at age 11, used PCP and "magic mushrooms," used LSD at least 1,000 times, and injected a combination of heroin and cocaine (known as "speedballs"). Dr. Blair explained all these drugs can affect the brain. Defendant also said he drank a case of beer and half a fifth of vodka every day for a 10- to 11-year period. He also claimed to have suffered five head injuries, three of which resulted in unconsciousness.

Dr. Blair opined defendant showed signs of institutionalization, a condition whereby a person becomes unable to function outside of the "highly regimented" structure of an institution. Dr. Blair agreed that if out of jail and not taking medication, defendant "would be a danger to himself and others," while it was "probably true" that "in prison, treated with the psychotropic drugs and under a controlled environment," he would not."

### 3. The prosecution's rebuttal

Forensic Psychiatrist Park Dietz, M.D., testified on rebuttal for the prosecution. Although he did not personally interview defendant, he reviewed

26

about 8,000 pages of records, three videotapes, and an audio tape. In Dr. Dietz's opinion, defendant's mind was functioning "perfectly adequately" when he was interrogated by law enforcement officers, in that he was logical, coherent, rational, and understandable. Based on defendant's observable behavior, Dr. Dietz saw "no evidence at all" of a psychotic disorder or organic brain damage and opined defendant's mind worked "at least as well" at the time of the crimes.

Dr. Dietz did not disagree with the jail's psychiatric team's diagnosis, but he also thought defendant met the criteria for having antisocial personality disorder, including running away from home, stealing, and breaking and entering as a youth, as well as exhibiting aggressive behavior, substance abuse, reckless disregard for the safety of others and himself, a lack of remorse, deceitfulness and constantly engaging in irresponsible and criminal conduct as an adult. He explained that people with antisocial personality disorder do not respond to treatment or discipline, although many respond to structure. "They tend to want to do anything they think will make them happy. . . . Nobody has found any way to change them yet."

Retired Marine Lieutenant Colonel Larry Kuester, defendant's commanding officer from 1978 through 1979 while he was a staff sergeant assigned to a heavy transport helicopter squadron in Tustin, testified regarding defendant's job performance. Defendant was the material chief for the squadron, a "difficult job" that served a "very critical function" relating to the flight readiness of the squadron and required exceptional dedication to the task at hand. He received "outstanding evaluations" from "very demanding" superiors and had the "tremendous honor" of being recommended for Warrant Officers School.

Kuester saw defendant on a weekly basis and thought he was a good marine. He never knew defendant to be intoxicated or hung over or to have a drug or alcohol problem. He explained the Marine Corps had a "zero tolerance" policy

27

on the use of drugs or alcohol while on duty, especially for aviation units where "lives were on the line" and minimum performance could not be tolerated even in training situations. Kuester did not believe it would be possible for someone on drugs or alcohol to perform defendant's job, as it required an "exceptional amount of motivation."

## II. DISCUSSION

### A. Asserted *Batson/Wheeler* Error

Defendant, who is African-American, contends the prosecutor in his case exercised racially discriminatory peremptory challenges against two African-American prospective jurors in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258, and that the trial court erred in denying his objections to these challenges. We disagree.

#### 1. Background

After hardship screening, 136 prospective jurors remained for voir dire. Voir dire began on September 29, 1998, and 71 potential jurors were questioned before a jury was selected. During voir dire, 17 prospective jurors were excused for cause or for hardship, pursuant to stipulation, or without objection, leaving 54 prospective jurors subject to peremptory challenge. The prosecutor exercised 19 peremptory challenges in selecting a jury, including two against African-American prospective jurors, and three peremptory challenges in selecting alternate jurors. The defense challenged 14 prospective jurors and two alternate jurors.

##### a) *Prospective Juror No. 719*

Prospective Juror No. 719, an African-American woman, was peremptorily challenged by the prosecution. On her written questionnaire in response to the question, "What are your GENERAL FEELINGS regarding the death penalty?," she wrote, "I don't like it!" She answered affirmatively the question whether she

held "religious beliefs which would impair your ability to serve as a juror on this type of case," and in the place that asked prospective jurors to explain their answers she wrote "Death." Prospective Juror No. 719 did not answer the questions asking if she would automatically refuse to vote for either the death penalty or life imprisonment without the possibility of parole without considering any of the aggravating and mitigating factors, or if she thought the death penalty was used too often, too seldom, or randomly.

On the first day of voir dire, Prospective Juror No. 719 asked to be excused due to hardship, specifically lower back pain caused by sitting. Her request was denied. During voir dire, Prospective Juror No. 719 indicated she was a 51-year-old widow, had graduated from high school, and had no prior jury service. She was unable to work due to disability and her "bad lower back" might preclude her from sitting for long periods of time. After the defense passed for cause, the prosecutor questioned Prospective Juror No. 719 as follows:

"Q. [W]ould it be correct to say that for religious reasons have you [*sic*] a problem with the death penalty?

"A. That is correct.

"Q. Okay. [¶] And would it also be fair to say that because of those religious beliefs, your personal beliefs, you'd have difficult[y] imposing the death penalty?

"A. That is correct.

"Q. And if given the chance to vote for life without possibility of parole, versus death, you'd probably always select life without possibility of parole over death. [¶] Is that a correct statement?

"A. That is a correct statement."

The prosecutor then challenged Prospective Juror No. 719 for cause, after which she was questioned further by the trial judge and counsel in chambers. The

judge began by explaining he wanted to clarify some of her "last answers to see what [her] feelings were." The judge then asked, "Are you telling the court and the parties that under no circumstances would you ever vote for the death penalty?" Prospective Juror No. 719 answered, "I just don't believe in it. I'm being honest." The judge asked whether her feelings "were so strong that no matter what evidence is presented, no matter what evidence is going to come in, you would never, under any circumstances, vote for the death penalty." Prospective Juror No. 719 replied, "I won't say that. [¶] It depends on the evidence also, I'd take that in consideration. But I just don't believe in it because we can't give life. . . . And I just don't believe in taking life." She confirmed this view was based on her religious beliefs. The judge asked whether, if the other jurors convinced her that death was the appropriate penalty, she could see herself voting for death, and Prospective Juror No. 719 responded, "I can't give you that answer." She indicated she would be willing to listen to the evidence before making a decision. She also reiterated she had a lower-back problem and it was painful for her to walk a long distance or to sit for a long period. The prosecutor asked Prospective Juror No. 719 whether "it would be very difficult for you to vote to put someone to death" because of her religious beliefs against the death penalty, to which she replied, "Oh, yes, definitely." When asked if she would be biased against voting for the death penalty because of her religious beliefs, Prospective Juror No. 719 disagreed: "I won't say that's a true statement because I have to look at the evidence. Depend[s] on the evidence." But she agreed that her feelings against the death penalty would make it "very difficult" for her to impose death.

Outside Prospective Juror No. 719's presence, the trial court indicated it was going to disallow the challenge for cause and asked defense counsel whether there was going to be a "*Wheeler* situation" if the prosecutor were to use  a

30

peremptory challenge on Prospective Juror No. 719. Defense counsel initially responded there would not: "I think that she gave answers that would probably give [the prosecutor] reason to use his peremptory in a nonracial manner." After further argument from the prosecutor regarding the for-cause challenge, however, defense counsel reconsidered, stating "we may very well be getting into a *Wheeler* situation" because "[g]iven the limited reservoir pool of potential [B]lack jurors, kicking any one off puts us in *Wheeler*." The court disagreed: "In view of the comments here, I'm not going to find any *Wheeler* error once [the prosecutor] excuses this juror. . . . And applying what I heard to be [defense counsel's] assessment of the juror's responses and the likelihood that a good prosecutor would challenge such a juror, I don't find any prima facie evidence of misconduct on the part of the prosecutor . . . and I just wanted to make that record before we go back out there." The prosecutor later exercised his fourth peremptory challenge against Prospective Juror No. 719.

### b) *Prospective Juror No. 213*

Prospective Juror No. 213 , an African-American man, was also peremptorily challenged by the prosecution. On the first day of voir dire, he asked to be excused due to hardship, specifically time and date conflicts related to doctors' appointments, an important school departmental meeting, plans to be out of town, and his practice and game commitments as a head basketball coach. His request was denied.

Prospective Juror No. 213's initial voir dire was done in chambers. He confirmed that the trial's predicted schedule would likely conflict with three or four of his team's basketball games. The prosecutor inquired about practice, noting the court was usually in session until 4:30 p.m. and asking whether this would prevent Prospective Juror No. 213 from practicing with his team the entire

time he served on the jury. Prospective Juror No. 213 said his team's practices had not yet been scheduled but they usually were from 2:00 to 3:30 p.m. If he were a juror he would have to schedule practice for the evening and this would be "tough on the kids" because "they're freshmen, and the freshmen parents rather would have them home by six."

After Prospective Juror No. 213 exited chambers, the defense advised the court "[w]e want him," while the prosecution indicated it was willing to stipulate to a hardship excusal. The proceedings then moved to open court, where the prosecutor asked Prospective Juror No. 213 about his 1995 jury service as the foreman in a murder trial, his testifying as a defense character witness for a friend accused of murdering his father, and psychological counseling he had received in high school about a girlfriend. The prosecutor asked about the difficulty serving on the jury would pose in terms of the prospective juror's being the head coach of the freshman boys' basketball team at the high school where he worked. Prospective Juror No. 213 confirmed their practices would have to be moved to the evening if he were picked for the jury. He said although he knew he would be a good juror, "my problem was it's just a matter of this trial is very, very important. The person's life is at stake. And that is very important. And I'm dealing with high school kids who everything they do is way more important than everything else in your life." He agreed with the prosecutor he felt "torn" between his responsibilities to his players and what his responsibilities would be as a juror.

The prosecutor lastly asked Prospective Juror No. 213 about his views on the death penalty. He said he "voted for it. It's a necessary thing that we must have to deter crime of a very, very violent nature." Prospective Juror No. 213 also agreed he had "mixed feelings" about the death penalty but nevertheless felt it was appropriate in some instances and he could impose it if warranted. The prosecutor

32

then passed for cause but exercised his next peremptory challenge, the prosecution's 17th, to excuse Prospective Juror No. 213.

At the next break, the defense objected to the peremptory challenge of Prospective Juror No. 213, arguing there were only two or three African-American prospective jurors "in the whole room, and two of them have been excused by peremptory challenge by the People. I'm just making my record in that regard. . . . So, we're contending that that establishes a systematic exclusion of the African-American potential jurors." The trial court disagreed with this representation as to the racial composition of the jury pool, saying, "[T]hat's an interesting observation, but, the Court is not accepting that . . . from my perspective there might be more. . . . [Y]ou folks keep saying there's only three out there. And I don't know that that's the case."

The court then denied the challenge as follows: "I don't find any basic finding that the district attorney is engaging in misconduct, that he systematically is excluding all [African]-Americans from serving as jurors on this case, or that he is systematically excluding any other minority group from serving on this particular case. [¶] [Prospective Juror No. 213] did submit a request to be excused for hardship, and . . . [i]n our discussion in chambers he indicated his reticence about serving, although he did opine that if actually selected, he will find a way to make his job work consistent with the nature of the jury duty. [¶] But, just watching his expression, and I have to put two things on the record: Yesterday when we broke in the evening one of the first prospective jurors to come up to the bailiff to get a hardship form was [Prospective Juror No. 213]. . . . [¶] So, when I came back out and advised him . . . that he needed to go take the jury seat, there was an audible groan and facial expression consistent with that as he moved from the clerk's area over to the chair. [¶] And just watching his demeanor, his facial expressions when he was inquired about his availability, I

33

thought he was indicating that it's going to be extremely difficult. Plus some of the other information that was disclosed to the deputy district attorney upon further inquiry. [¶] So, I think we have to be careful, when you make a challenge of this nature, that the court give a legitimate consideration. And I don't mean to make less of the challenge. If I thought that it was even close, I would make the deputy district attorney state on the record his feeling as to why he was excusing [Prospective Juror No. 213], but, there was ample reason to excuse both of those, other than dealing with race. [¶] And based on your offer of proof, I'm just denying the challenge."

### 2. Analysis

"Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race. [Citations.] Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." (*People v. Lenix* (2008) 44 Cal.4th 602, 612.)

"There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 (*Bonilla*).) "A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has

34

shown purposeful race discrimination.  [Citation.]  'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 75.)

In both peremptory challenges at issue here, the trial court found no prima facie case of discriminatory use and overruled defendant's motion[10] without asking the prosecutor to state his reasons for the challenges.  Because the trial predated the United States Supreme Court's decision in *Johnson v. California* (2005) 545 U.S. 162, and exactly what standard the lower court used in finding no prima facie case is unclear, "we review the record independently to 'apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror' on a prohibited discriminatory basis." (*People v. Bell* (2007) 40 Cal.4th 582, 597 (*Bell*).)

"In deciding whether a prima facie case was stated, we consider the entire record before the trial court [citation], but certain types of evidence may be especially relevant:  '[T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group.  He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole.  Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions

---

**10**     Although defendant relied solely upon *Wheeler* at trial and did not invoke *Batson*, we have recognized that an objection on the basis of *Wheeler* also preserves claims that may be made under *Batson*. (E.g., *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1008, fn. 9 (*Lewis and Oliver*).)

35

at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.' " (*Bonilla*, *supra*, 41 Cal.4th at p. 342.)

In this case, the record does not support an inference of discriminatory intent on the part of the prosecutor in peremptorily challenging Prospective Jurors Nos. 719 and 213. Even assuming the basis of defendant's argument is factually accurate—that Prospective Jurors Nos. 719 and 213 were the only two African-Americans in the 136-person jury pool, a fact neither conceded nor confirmed at trial—the bare circumstance that *all* African-American prospective jurors were struck from the pool would be insufficient in this case to support an inference that the two were challenged because of their race. " '[T]he small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible. "[E]ven the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion." ' " (*Bonilla*, *supra*, 41 Cal.4th at p. 343; see *Bell*, *supra*, 40 Cal.4th at p. 598.)[11]

---

[11] "As we have previously explained, 'the ultimate issue to be addressed . . . "is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias." [Citation.] But in drawing an inference of discrimination from the fact one party has excused "most or all" members of a cognizable group'—as [defendant] asks the court to do here—'a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges.' [Citation.] Such a pattern will be difficult to discern when the number of challenges is extremely small." (*Bonilla*, *supra*, 41 Cal.4th at p. 343, fn. 12.)

36

Nor does defendant show the prosecutor used a disproportionate number of his peremptories against the group. The prosecutor exercised a total of 22 peremptory challenges, only two of which were exercised against African-American prospective jurors. (Cf. *Bell*, *supra*, 40 Cal.4th at p. 598 [no disproportionate use of peremptories where only two of the prosecutor's 16 peremptory challenges were exercised against African-American women].)[12] That the prosecutor used his 4th and 17th peremptory challenges against Prospective Juror Nos. 719 and 213 also distinguishes this case from *Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, upon which defendant relies. In *Williams*, the prosecutor used three of his first four peremptory challenges to dismiss African-American prospective jurors, a circumstance the court found supported a prima facie showing based on statistical disparity alone. (*Id.* at pp. 1107–1109.)

The prosecutor's voir dire of the two prospective jurors at issue was by no means desultory or cursory. And although it is true "defendant himself is African-American that fact alone does not establish a prima facie case of discrimination." (*People v. Kelly* (2007) 42 Cal.4th 763, 780.)

---

[12] As this court has previously noted, "[a] more complete analysis of disproportionality compares the proportion of a party's peremptory challenges used against a group to the group's proportion in the pool of jurors subject to peremptory challenge." (*Bell*, *supra*, 40 Cal.4th at p. 598, fn. 4.) In *Bell*, the prosecutor "used two of his 16 peremptory challenges, or 12.5 percent, against African-American women, while of the 47 prospective jurors who were subject to peremptory challenge, three, or about 6.4 percent, were African-American women. Though the former figure [was] almost twice the latter, because of the small sample size the disparity carrie[d] relatively little information." (*Ibid.*) Here, the disparity between the number of peremptory challenges used against African-American prospective jurors (two out of a total of 22 or 9.1 percent) and the proportion of African-American prospective jurors in the pool of jurors subject to peremptory challenge (allegedly two out of 54, or 3.7 percent) similarly carries little information in light of the similarly small sample size.

37

Lastly, we note the information elicited in voir dire showed race-neutral reasons for excusing both prospective jurors. (See *People v. Scott* (2015) 61 Cal.4th 363, 384 ["A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias."].) As defense counsel initially conceded with respect to Prospective Juror No. 719, the answers she gave regarding her views on the death penalty gave the prosecutor "reason to use his peremptory in a nonracial manner." And Prospective Juror No. 213's answers and demeanor indicated he was reluctant to serve on the jury. The prosecutor specifically referenced this reluctance—"I take from it some things you said and the way you walked to the jury box, you're not thrilled"—and the trial court made express factual findings in this regard.

In sum, defendant fails to demonstrate that the totality of relevant circumstances gives rise to an inference of discriminatory purpose in the prosecutor's exercise of peremptory challenges against these two prospective jurors. As the trial court found no prima facie showing and the prosecutor did not state reasons for the excusals, we further decline defendant's request to conduct a comparative analysis of the prospective jurors' responses on the jury questionnaire for the first time on appeal. (See *People v. Harris* (2013) 57 Cal.4th 804, 836; *People v. Dement* (2011) 53 Cal.4th 1, 21; *Bell*, *supra*, 40 Cal.4th at pp. 600–601.)

## B.    Custodial Statement

As summarized above, defendant was in prison in June 1996 on an unrelated matter when DNA testing connected him to the six murders. Law enforcement officers subsequently interrogated him five times about these crimes. All the interrogations were audio- or video-recorded. During these interrogations, defendant was repeatedly advised of his rights under *Miranda v. Arizona*, *supra*,

38

384 U.S. 436 and, in all but the initial interrogation, explicitly agreed to talk to the officers and made various incriminating statements. Before trial, defendant moved for an order excluding these statements from the guilt phase. After a multiday hearing, the court denied the motion without comment. On appeal, defendant claims his custodial statements were obtained in the absence of a valid waiver of his *Miranda* rights and after he repeatedly invoked his right to silence during the initial interrogation, and admission of the statements constituted prejudicial error. We are not persuaded.

"[A] defendant must be advised of his or her *Miranda* rights, and must make a valid waiver of these rights, before questioning begins or any statements resulting from interrogation can be admitted." (*People v. Rundle* (2008) 43 Cal.4th 76, 114 (*Rundle*).) Such a waiver under *Miranda* must be "knowingly, intelligently, and voluntarily made." (*Id.* at p. 115.) Because the crimes at issue were committed before Proposition 8's 1982 effective date,[13] the prosecution had to establish the validity of defendant's *Miranda* waiver beyond a reasonable doubt. (See *People v. Sapp* (2003) 31 Cal.4th 240, 267 [for crime committed before June 9, 1982, Prop. 8's effective date, the prosecution must prove the

---

**13** Proposition 8 made a number of changes in the constitutional and statutory law of this state governing criminal prosecutions, including adding section 28 to article I of the Constitution. As pertinent here, section 28, subdivision (f)(2), called Right to Truth-in-Evidence provision, provides: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, *relevant evidence shall not be excluded in any criminal proceeding*, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." (Italics added.)

39

voluntariness of a confession beyond a reasonable doubt; for crime committed on or after June 9, 1982, the preponderance standard applies]; *People v. Weaver* (2001) 26 Cal.4th 876, 921, fn. 5 ["the date of the crime, and not the date of the confession, is the controlling benchmark" for the proper burden of proof].) Although no such argument was made at trial, we conclude sufficient evidence exists from which the trial court could have found beyond a reasonable doubt that, once advised of his *Miranda* rights, defendant made a knowing and intelligent waiver of those rights.

At the outset of the initial interrogation, Detective Redmond read defendant his *Miranda* rights and defendant confirmed he understood each right. He was not formally asked to waive those rights, and he did not volunteer to do so. The following exchange then occurred:

"Detective Redmond: Do you want to talk to us about . . . anything that might have occurred back, '79, '80[?]

"[Defendant]: '79, '80, why, *why would I want to talk to you about something that occurred back then*?

"Detective Redmond: Well, some things have come up and . . . we need to talk to you about them, you can stop talking at any time.

"[Defendant]: I can't . . . imagine why I would want to talk with the Costa Mesa Police Department.

"Detective Redmond: [A]re you familiar with DNA?

"[Defendant]: Yes, a little bit.

"Detective Redmond: When you got out of prison the last time, did you have to give them a blood sample?

"[Defendant]: Right. [¶] . . . [¶]

40

"Detective Redmond: [W]e are going to be just right up front with you . . . , your DNA came up on a couple of Costa Mesa homicides back in 1979, and . . . .

"[Defendant]: I never lived in Costa Mesa.

"Detective Redmond: Ok. Have you ever been to Costa Mesa?

"[Defendant]: Well, I've gone through there, yes." (Italics added.) Redmond and investigator Giesler then proceeded to ask defendant questions about his life in Orange County in the late 1970s and 1980s and his family background. Defendant answered the questions, sometimes asked clarifying questions, and often volunteered additional information.

Defendant argues his statements should have been excluded because he never expressly waived his right to silence and nothing about his actions demonstrates he intended to waive that right. It is well settled that law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview and that a valid waiver of such rights may be implied from the defendant's words and actions. (See *Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 ["a waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver' "]; *People v. Davis* (1981) 29 Cal.3d 814, 824 (*Davis*) ["The absence of an express waiver does not in itself establish that the right has been invoked."].) "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " (*North Carolina v. Butler* (1979) 441 U.S. 369, 374–375]; accord, *People v. Duren* (1973) 9 Cal.3d 218, 238.) "In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and

41

intelligently waived them." (*People v. Cunningham* (2015) 61 Cal.4th 609, 642; accord, *People v. Johnson* (1969) 70 Cal.2d 541, 558.)

Such is the case here. After Detective Redmond read defendant his *Miranda* rights and defendant confirmed he understood them, he proceeded to actively participate in the conversation with the detectives—answering questions, asking for clarification, and generally contributing to a discussion he knew was being tape-recorded. There is no suggestion the detectives resorted to physical or psychological pressure to coerce defendant to talk to them. Defendant, moreover, had extensive prior experience with the criminal justice system, having been arrested and pleaded guilty to felonies in three previous cases before being interrogated in this case. These circumstances are sufficient to permit an inference beyond a reasonable doubt that defendant understood he had a choice whether or not to talk to the detectives, with or without an attorney present, and knowingly and voluntarily chose not to exercise his right to remain silent. (See, e.g., *People v. Cruz* (2008) 44 Cal.4th 636, 668–669 (*Cruz*); *People v. Sully* (1991) 53 Cal.3d 1195, 1233; *Davis*, *supra*, 29 Cal.3d at pp. 823–826.)

Defendant attempts to avoid this outcome by arguing his response to the detective's asking if he wanted to talk—"[W]hy would I want to talk to you about something that occurred back [in 1979 or 1980]?"—was a rhetorical question commonly understood to mean "no," and that it was inconsistent with a present willingness to discuss the case and should have been viewed as an invocation of the right to silence. To the extent the response was equivocal or ambiguous, he contends the detective's subsequent questioning went beyond the limited purpose of determining whether he intended to remain silent in an improper attempt to skirt the issue of invocation. We disagree. Taken in context, defendant's statement was reasonably understood as seeking to clarify why the Costa Mesa detective and

42

investigator wished to speak with him, rather than as an invocation of the right to remain silent.

In the alternative, defendant contends that even if he impliedly waived his right to remain silent at the outset of the initial interrogation, the detectives were required to terminate their questioning when, later in the interrogation, he assertedly several times invoked the right to stop answering questions. (See, e.g., *Rundle*, *supra*, 43 Cal.4th at p. 114 ["Even if a defendant voluntarily has waived his or her *Miranda* rights to remain silent and to have counsel present, the defendant later may revoke the waiver."].) Under California law applicable at the time the crimes were committed, once a suspect invoked his right to silence, police had to cease all questioning and could not subject the suspect to a new round of interrogation even if they repeated the *Miranda* warnings. (*People v. Fioritto* (1968) 68 Cal.2d 714, 719–720 [holding all further attempts at police interrogation should have ceased once the defendant indicated he intended to assert his *Miranda* rights]; see *People v. Pettingill* (1978) 21 Cal.3d 231, 242–245 (*Pettingill*) [reaffirming *Fioritto* and declining to follow *Michigan v. Mosley* (1975) 423 U.S. 96, which instead adopted a factual test turning on the circumstances of the renewed police interrogation in cases where the suspect had asserted his right to remain silent].)

In support of this argument, defendant points to the italicized statements in the following exchange, which occurred toward the conclusion of the initial interrogation when the discussion turned to the DNA evidence connecting defendant to the murders:

"Detective Giesler: I mean 17 years is long enough, I think it's time to talk about it, don't you?

"[Defendant]: Oh yeah.

"Detective Giesler: Why don't you tell us what happened?

43

"[Defendant]:  The thing is, *I will reserve the right to speak at another time*, let's say I . . . .

"Detective Giesler:  I'm not going to do anything to violate your rights Gerald, I mean, we read you your rights and, I'm not going to step on your toes, but . . . .

"Detective Redmond:  I think this weight's been on [you] long enough.

"Detective Giesler:  You know, . . . I waited 17 years.

"[Defendant]:  Yeah.  You and a whole lot of other people.  [¶] . . . [¶]

"Detective Giesler:  I'm speaking the truth to you [regarding the DNA evidence] and all I can ask in return is that you speak the truth to me.  Get the monkey off your back.

"Detective Redmond:  I think you deserve that more than anybody.

"[Defendant]:  Yeah, *the day is not today though*.

"Detective Giesler:  Why is today not the day?

"[Defendant]:  *I can't take it*.  [¶] . . . [¶]

 "Detective Redmond:  [G]et it off your chest, well, give somebody the reason why?  Everybody's got a reason.

"[Defendant]:  Yeah, but *there's also a reason for wanting to wait too*.

"Detective Giesler:  Can you explain that, can you explain that to me?

"[Defendant]:  Now, this is going to be a long drawn out process, the rest of my life is going right out the door, it probably went out the door years ago, I just didn't recognize it.  [¶] . . . [¶]

 "[Defendant]:  [L]ike I say, once again, . . . there's I think for me, there's a time, and a place for saying what I have to say, and, in reference to what happened, I, I *there's nothing else that I can tell you*.  [¶] . . . [¶]

"Detective Giesler:  Gerald, I can guarantee you, they're going to say, Lynda, did he say why?  Can you tell me why?  Can you try to tell me why?  Did you know any of these women?

"[Defendant]:  Like I say, *I think I should wait until later on before . . . .* [¶] . . . [¶]

"Detective Giesler:  . . . I don't understand what you're saying to me, are you saying, okay Lynda, when I get to Orange County, come and see me?  [¶] . . . [¶]  Are you saying, Lynda, I don't want to talk to you? . . .  [¶] . . . [¶]

"[Defendant]:  No, no, this, this, I, *I just need some time* to call upon myself, to bring, to draw up on some strength.  [¶] . . . [¶]  To say what I have to say.  [¶] . . . [¶]  When they take me down there, yes, you can come back.

"Detective Giesler:  I can come and talk to you at that time?

"[Defendant]:  Right.  [¶] . . . [¶]

"Detective Giesler:  [A]re you serious, when you get down to Orange County, I can come see you again?

"[Defendant]:  Right.  Right.  [¶] . . . [¶]  I'll be there.

"Detective Giesler:  Okay, I will too.  Now, again, because I don't want to play head games with you, we did not come up here alone today, . . . there is an investigator with us from the city of Tustin who wants to talk to you, so we're going to see what his availability is . . . .  [¶] . . . [¶]

"[Defendant]:  Tustin the only one here?

"Detective Giesler:  At this time, yeah.  That's what Bill said earlier . . . . [¶] . . . [¶]  Do you have any questions you want to ask us . . . ?

"[Defendant]:  No, ma'am.  [¶] . . . [¶]  I'm pretty much abreast of . . . you know, the situation.  [¶] . . . [¶]  And there's not a whole lot that I can think of right now that I can say.

45

"Detective Giesler:  Okay, I also want to share with you . . . once . . . Tustin completes their conversation with you, we are going to collect some physical evidence from you . . . .

"[Defendant]:  Right.

"Detective Giesler:  Okay, and would that be a problem for you?

"[Defendant]:  No.

"Detective Giesler:  Okay. . . .  I don't know when, you don't know when, but we will talk again.

"[Defendant]:  Yeah.

"Detective Giesler:  And if you want to talk to me at that time, fine, and if you want to tell me to pound, [that's] fine, okay?

"[Defendant]:  Right.

"Detective Giesler:  I'll be fair with you, you be fair with me.

"[Defendant]:  All right."  (Italics added.)

Redmond and Giesler then left the interview room.  A short time later, Tarpley entered the room, informed defendant he wished "to discuss another case besides Costa Mesa," and readvised defendant of his *Miranda* rights.  Tarpley then asked, "Would you like to talk about why I'm here today?" to which defendant replied, "Yes."

Whether defendant invoked his right to remain silent with the italicized statements represents a close question under pre-Proposition 8 law.  (Compare *People v. Stitely* (2005) 35 Cal.4th 514, 535 ["the suspect 'must *unambiguously*' assert his right to silence or counsel"] with *People v. Randall* (1970) 1 Cal.3d 948, 955 ["no particular form of words or conduct is necessary" for a suspect to invoke his *Miranda* rights because "[t]o strictly limit the manner in which a suspect may assert the privilege, or to demand that it be invoked with unmistakable clarity (resolving any ambiguity against the defendant) would subvert *Miranda*'s

46

prophylactic intent].)"  However, although our cases made clear that " '[a] desire to halt the interrogation may be indicated in a variety of ways,' " (*People v. Hayes* (1985) 38 Cal.3d 780, 784 (*Hayes*)), they also made clear that "the words used by the suspect 'must be construed in context.' "  (*Id.* at pp. 784–785.)

For example, in *In re Joe R.* (1980) 27 Cal.3d 496, the suspect was accused of robbery and murder.  For the first 30 to 40 minutes of interrogation, he was questioned about his whereabouts during the previous 24 hours and sought to provide an alibi, insisting that he was not involved in the robberies or murder.  At a certain point, he announced, " ' "That's all I have to say." ' "  (*Id.* at p. 513.) The officer then changed the subject to explain the concept of felony murder, and the conversation continued from there; eventually, the suspect confessed.  While the defense argued at trial that the defendant had revoked his earlier waiver of the right to remain silent by saying, " ' "That's all I have to say," ' " (*ibid.*) the prosecution insisted that he simply meant, " ' "that's my story.  I'm going to stick with it," ' " referring to the alibi he had provided (*id.* at p. 514).  After examining the suspect's statement in the context of the conversation, we found the prosecution's characterization of the exchange more credible, and upheld the trial court's finding that the suspect did not attempt to halt the interrogation altogether. (*Id.* at p. 516.)

Similarly, in *Hayes*, *supra*, 38 Cal.3d 780, the defendant expressed reluctance to continue participating in an interrogation after he had made an initial confession.  The investigating officer told the defendant, " 'We know about Vermont and Florence, Tom's Hamburger.  We know about the market, 84th and Main. What we'd like from you is your side of it.' "  (*Id.* at p. 784, fn. 2.)  In response to these accusations, the defendant confessed to the shooting:  " 'Well, actually it was self-defense.  [¶]  . . . Well, that dude was reaching for a gun, so I just shot him.  [¶]  . . . I admit to it . . . .' "  (*Ibid.*)  When the officer pressed for

47

more detail, the defendant asked, " 'Do I gotta still tell you after I admit it?' " (*Ibid.*) The officer continued to press the defendant for more details, which the defendant ultimately provided. We concluded that the defendant had not invoked the right to halt the interrogation; rather, he simply did not want to delve into the details behind his confession, and his "reluctance [was] an understandable reaction to a confession of multiple robbery-murder, and does not rise to the level of an implied assertion of the defendant's constitutional right to cut off questioning." (*Id.* at p. 786.)

Here, although defendant made statements suggesting he did not want to talk further with the Costa Mesa detective and investigator, he also indicated a willingness to speak with them in the future. As Redmond and Giesler terminated their questioning, not only did defendant make no objection when informed a detective from Tustin wished to speak with him about a different case, after Tarpley subsequently readvised defendant of his *Miranda* rights and asked whether defendant was willing to talk to him "about why I'm here today," defendant responded in the affirmative. From the exchange that followed, it appears defendant wished to speak to Tarpley because he wanted to know whether his attack on the pregnant D. Green in her Tustin apartment had put her husband, a fellow Marine, on death row, with defendant later admitting "out of all these murders and the crimes that I committed over the years, that was the one that bothered me the most . . . ." This record supports the conclusion that any asserted refusal to continue talking at that time applied only to Redmond and Giesler, and did not extend to Tarpley. We therefore conclude that even assuming defendant sought to invoke his right to terminate the questioning by Redmond and Giesler, under the totality of the circumstances that limited invocation did not bar Tarpley from interrogating defendant about the Tustin offenses after readvising him of his *Miranda* rights, confirming defendant was willing to speak to him, and thereby

48

obtaining a waiver of those rights.**14** (See *People v. Watkins* (1970) 6 Cal.App.3d 119, 124 [recognizing the prospect of a selective waiver of rights]; cf. *Davis*, *supra*, 29 Cal.3d at pp. 824–825 [resumption of custodial questioning was not improper where the defendant had not hesitated to speak with "the interrogating officers about all aspects of the case" and where his "failure to respond when asked if he would speak to the polygraph administrator" was properly viewed not as "a general assertion of his right to remain silent" but rather only as an indication that he was "unwilling to submit to the scrutiny of the lie detector"].)

Later during the course of this interrogation, defendant reinitiated contact with Redmond and Giesler by asking Tarpley whether "Costa Mesa is still here" and stating "then we can . . . get this over with." In context, defendant was asking for the Costa Mesa detectives to come back so he could confess. This reinitiation of contact with Redmond and Giesler superseded any prior invocation he may have made. (See *People v. Jackson* (1980) 28 Cal.3d 264, 302 [" ' "A suspect who has asserted his rights and prevented further lawful interrogation nonetheless retains the option, thereafter, *voluntarily* to initiate a confession." ' "].)

## C. Refusal to Instruct on Unconsciousness

At the conclusion of the guilt phase, the trial judge instructed the jury on the mental states necessary for each charged crime (CALJIC No. 3.31.5) and on

---

**14** *Pettingill*, *supra*, 21 Cal.3d 231, which the concurring and dissenting opinion relies on, is inapposite. There, after being advised and later readvised of his *Miranda* rights, the defendant immediately invoked his right to remain silent at the onset of the first and second attempts to interrogate him, clearly indicating he did not wish to speak to the police at all. By comparison and as discussed above, to the extent there was an invocation of the right to silence in this case, it came at the end of the initial interrogation and, viewed in light of the totality of the circumstances, was limited to Redmond and Geisler continuing to question defendant at that time about the Costa Mesa offenses.

the partial defenses of diminished capacity (CALJIC Nos. 8.77, 8.79, combined)[15] and voluntary intoxication (CALJIC Nos. 4.21, 4.22). Defendant contends the court committed prejudicial error when it denied his request for additional instructions on the defense of unconsciousness (CALJIC Nos. 4.30, 4.31).[16] We disagree.

"Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417 (*Halvorsen*); see § 26, class four [among those persons deemed incapable of committing crimes are individuals who "committed the act charged without being conscious thereof"].) "If the defense presents *substantial evidence* of

---

[15]     The crimes at issue in this case were committed before the diminished capacity defense was abolished in 1981. (See *People v. Elmore* (2014) 59 Cal.4th 121, 143–144.)

[16]     CALJIC No. 4.30 would have instructed the jury: "A person who while unconscious commits what would otherwise be a criminal act, is not guilty of a crime. [¶] This rule of law applies to persons who are not conscious of acting but who perform acts while asleep or while suffering from a delirium of fever, or because of an attack of [psychomotor] epilepsy, a blow on the head, the involuntary taking of drugs or the involuntary consumption of intoxicating liquor, or any similar cause. [¶] Unconsciousness does not require that a person be incapable of movement. [¶] Evidence has been received which may tend to show that the defendant was unconscious at the time and place of the commission of the alleged crime for which he is here on trial. If, after a consideration of all the evidence, you have a reasonable doubt that the defendant was conscious at the time the alleged crime was committed, he must be found not guilty."

CALJIC No. 4.31 would have instructed: "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged crime the defendant acted as if he were conscious, you should find that he was conscious, unless from all the evidence you have a reasonable doubt that the defendant was in fact conscious at the time of the alleged crime. [¶] If the evidence raises a reasonable doubt that the defendant was in fact conscious, you must find that he was then unconscious."

unconsciousness, the trial court errs in refusing to instruct on its effect as a complete defense." (*Halvorsen*, *supra*, at p. 417, italics added.)

In requesting jury instructions on the defense of unconsciousness, counsel argued it was possible defendant's voluntary ingestion of alcohol and drugs became involuntary at some point when the continued consumption of alcohol and drugs caused him to "black out." The trial court noted the absence of any expert testimony supporting this theory and denied the request, stating, "[T]he reason we got into this subject was the People introduced the defendant's statement. In his statement he says that due to the consumption of alcohol he was not conscious of certain behavior or conduct. . . . So if the state of the evidence is that the . . . taking of alcohol or drugs was voluntary on the part of the defendant, it would appear that there's a lack of foundation for giving this instruction."

On appeal, defendant argues for the first time that the requested instructions should have been given because there was evidence of unconsciousness "totally unrelated to [his] consumption of alcohol." This claim is forfeited. (See generally *People v. Partida* (2005) 37 Cal.4th 428, 435 ["A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct."].) Even were the claim not forfeited, we would find it without merit.

In support of his contention the record contained evidence of unconsciousness unrelated to alcohol consumption, defendant cites his mentioning, in his response to questions about Debora Kennedy's murder, that he had previously experienced "blackouts":

"Investigator Tarpley: Okay, . . . have you ever killed anybody in your entire life?

"[Defendant]: If I have, that's something I'm not knowledgeable about.

"Investigator Tarpley: You might have killed somebody, but you just don't have knowledge of it today?

51

"[Defendant]:  True.

"Investigator Tarpley:  Okay, and that would be because of drugs and . . . .

"[Defendant]:  Drugs and alcohol use.  I, I have been a drug and alcohol user for years.  I just abuse, abuse over and over.

[The tape in the recorder was changed and [defendant] confirmed nothing was said while the recorder was off.]

"Investigator Tarpley:  Okay. . . .  [T]he last thing I think we talked about was that you might have done a homicide, but if you did do it, you don't have any knowledge of it.

"[Defendant]:  Right.

"Investigator Tarpley:  It would have been when you were under the influence of drugs or something like that?

"[Defendant]:  Right.

"Investigator Tarpley:  Gerald, I feel comfortable talking to you and I think you feel comfortable . . . talking to me.

"[Defendant]:  Correct.

"Investigator Tarpley:  Okay?  . . .  I've got a job to do . . . and I do have an obligation to this girl's . . . family . . . .  You lived practically almost on the same street as her.

"[Defendant]:  Right.

"Investigator Tarpley:  You might have done, is it possible that you might have done something to her that today, that if you had it to do over again, you wouldn't do?

"[Defendant]:  I hope to God not, you know, like I said, I never, I can't recall ever seeing this woman and I don't think so.

"Investigator Tarpley:  Would it be possible that early in the morning one, one day in October, 1979, that you might have gone into a . . . two story

52

apartment, gone in through the ground floor, and found a woman in bed and . . . might have attacked her, but just might not remember her . . . because of the condition that you were in?  Would that be possible?

"[Defendant]:  It's possible.

"Investigator Tarpley:  Okay.

"[Defendant]:  And the reason why I say it's possible because, just because what some of the people that I have known have told me about.  I, I have friends that told me that I black out sometimes and say things, have said things and done things that I don't recall, you know, that they said I did, I don't know . . . ."

Defendant argues his responses referring to the possibility that he committed the crime in a blackout could be construed to mean his bouts of unconsciousness were not drug- or alcohol-related because he did not refer to drugs or alcohol when he said that friends had told him he sometimes blacked out. In light of this possibility, he contends the trial court erred in not giving the requested instructions on unconsciousness because "the task of determining which of these constructions was accurate, was for the jury, not for the judge."  We disagree.

The clear implication from the cited conversation as a whole was that defendant's supposed blackouts were the result of his drug and alcohol abuse.  The conversation began with defendant claiming he had not, to his knowledge, "ever killed anybody," but admitting he "might have killed somebody" he did not know about while under the influence of alcohol and drugs.  The question immediately preceding the blackout statement specifically referred to this discussion.  Tarpley asked defendant if it was possible he had attacked Kennedy but did not remember her "because of the condition that you were in?"  Defendant agreed that was a possibility "because . . . I have friends that told me that I black out sometimes and . . . have said things and done things that I don't recall."  Fairly read in context, the

statement regarding blackouts is evidence of, if anything, the effects of defendant's voluntary alcohol and drug consumption, and not of unrelated and unexplained unconsciousness.

Even if the meaning of defendant's blackout statement had been unclear, this vague, isolated remark does not constitute *substantial* evidence that defendant blacked out at any time during the crimes at issue, or that if this happened it would have been as a result of something other than the voluntary consumption of drugs and alcohol. This is particularly true where defendant's initial lack of recollection was followed by detailed confessions to six murders whose commission suggested planning and premeditation. His substantial recall of the crimes some 17 years later confirmed he did not lack awareness of his actions during the course of the offenses. (Cf. *Halvorsen*, *supra*, 42 Cal.4th at p. 418 [the defendant's testimony demonstrated "he did not lack awareness of his actions during the course of the offenses" and "[t]he complicated and purposive nature of his conduct in driving from place to place, aiming at his victims, and shooting them in vital areas of the body suggest[ed] the same"].) Even had defendant properly preserved this issue for appeal, there being no evidence defendant was not conscious of his criminal actions within the meaning of section 26, the court did not err in refusing to instruct the jury on the defense of unconsciousness.

### D.     Victim Impact Evidence

As summarized above, six penalty phase witnesses testified regarding the impact on their lives of the murders of five of the victims, and the jury heard a poem and statement from two additional family members. Prior to the beginning of the penalty phase, defendant generally objected to the introduction of any victim impact testimony or photographs depicting the victims in life on the ground this evidence would be unduly emotional and prejudicial; the trial court overruled

54

these objections. While the witnesses were on the stand, however, defendant did not specifically object to the admission of any particular testimony. At the conclusion of the penalty phase, defendant objected to the victim impact testimony on due process grounds; the court ruled the objection was untimely and meritless. After the trial, defendant unsuccessfully moved for a new trial on the ground the victim impact testimony was so prejudicial it denied him a fair trial and due process of law.

Now on appeal, defendant claims the admission of "highly emotional and largely irrelevant" victim impact testimony violated his state and federal constitutional rights and requires reversal of the death sentence. He advances several arguments in support of this contention, none of which is persuasive.

"As we have repeatedly held, victim impact evidence is relevant and admissible pursuant to section 190.3, factor (a) as a circumstance of the crime so long as it is not 'so unduly prejudicial' that it renders the trial 'fundamentally unfair.' " (*People v. Russell* (2010) 50 Cal.4th 1228, 1264; see *Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1056 ["Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible . . . ."].) "Admission of testimony presented by a few close friends or relatives of each victim, as well as images of the victim while he or she was alive, has repeatedly been held constitutionally permissible." (*Russell*, *supra*, at p. 1265; see *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [" '[T]he state has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' "].)

Defendant first urges this court to follow other jurisdictions and affirmatively limit victim impact evidence to one witness per victim absent special

55

circumstances, to require an evidentiary hearing before a family member is allowed to testify and that the testimony be submitted in writing, and to place other specific limits on the amount, kind, and source of such evidence, citing *State v. Muhammad* (1996) 145 N.J. 23, 54–55, and *Salazar v. State* (Tex.Crim.App. 2002) 90 S.W.3d 330, 332.  We have repeatedly declined similar invitations to establish bright-line limitations on victim impact evidence and do so again here. (See, e.g., *People v. Suff* (2014) 58 Cal.4th 1013, 1075 (*Suff*); *People v. McKinnon* (2011) 52 Cal.4th 610, 690; *People v. Carrington* (2009) 47 Cal.4th 145, 196–197 (*Carrington*).)

Defendant argues the penalty phase judgment must be reversed because the victim impact witnesses gave "cumulative, emotional and inflammatory recitations with virtually no limitations."  He cites as examples Joseph Lee, who both testified and read a prepared statement regarding the death of his mother, Marolyn Carleton, when he was nine years old; Mary Lee, who read both a prepared statement regarding the death of Carleton, her sister, and a poem their mother, who was deceased at the time of the trial, had written in memory of Carleton; and Jackie Bissonnette, who read a prepared statement regarding the death of her sister, Debra Senior, and a statement from their mother that included two poems Senior had written.

Defendant forfeited this argument by failing to object during the relevant testimony.  (See, e.g., *People v. Brady* (2010) 50 Cal.4th 547, 576 (*Brady*).) Nonetheless, we have reviewed the cited testimony and find it fell well within the scope of permissible victim impact evidence.  (See, e.g., *Suff*, *supra*, 58 Cal.4th at p. 1076 [poem victim had written "contributed to the picture of the victim who was taken from the family by defendant"]; *People v. Jurado* (2006) 38 Cal.4th 72, 132–134 [witnesses properly testified as to the impact of the murder on themselves and on other family members who did not testify].)  The testimony was not

56

voluminous or repetitive, nor was it so emotionally charged as to evoke an irrational or purely subjective response from the jury. The circumstance that some jurors may have been moved to tears when Joseph testified did not render his testimony necessarily inflammatory or unduly prejudicial. (See, e.g., *People v. Romero and Self* (2015) 62 Cal.4th 1, 47; *People v. Linton* (2013) 56 Cal.4th 1146, 1204; *Brady*, *supra*, at pp. 575–576; *Jurado*, *supra*, at pp. 132, 134.)

Defendant also contends the victim impact testimony included "irrelevant, prejudicial information about illnesses and unfortunate circumstances family members had suffered that had no logical connection" to the murders, such as Carleton's mother's dying of cancer before the trial, Debora Kennedy's sister's decision to marry a possessive man described by one witness as a neo-Nazi and isolating herself from the family, and Debra Senior's mother's belief that her father died three years after the murder from myocardial infarction because "his heart was broken." Defendant argues this particular evidence went "far beyond a 'quick glimpse' into each victim's life" and improperly "gave the jury the impression that [he] was responsible for more than just the direct harm caused by his crime and was to be punished for subsequent death and disease as well." Again, defendant did not specifically object to the contested testimony on these grounds, forfeiting these arguments on appeal. (*Brady*, *supra*, 50 Cal.4th at p. 476.)

In any event, evidence regarding why Marolyn Carleton's mother did not testify was admissible "to dispel any potential negative implication that might be drawn by the jury or by defense counsel based upon the prosecution's failure to call" her as a witness. (*Carrington*, *supra*, 47 Cal.4th at p. 197 [evidence of the death of victim's mother and the illness of her father was admissible to explain why they were not called to testify].) Testimony regarding a sister's marital and familial difficulties was admissible to demonstrate the enduring effects of the

57

violent murderous assault on Debora Kennedy and certainly was not unduly inflammatory or prejudicial nor of such a nature as to invite an irrational or purely emotional response from jurors. (See, e.g., *People v. Hamilton* (2009) 45 Cal.4th 863, 926 [" 'circumstances' of the crime under section 190.3, factor (a) are not merely the immediate temporal and spatial circumstances of the crime, but extend to that which surrounds the crime materially, morally, or logically" and included evidence regarding the victim's husband's "continued depression and suffering for over 16 years from the time of the murder, the details of his use of alcohol near the end of his life, and the circumstances of his death"]; see also *id*. at p. 927; *People v. Brown* (2003) 31 Cal.4th 518, 573 ["It is common sense that surviving families would suffer repercussions from a young woman's senseless and seemingly random murder long after the crime is over."].)

To suggest Debra Senior's father died of a broken heart was arguably improper speculation as to the possible effect of her murder on his health. (See *Brady*, *supra*, 50 Cal.4th at pp. 577–578; *Carrington*, *supra*, 47 Cal.4th at p. 197.) Defendant, however, fails to demonstrate prejudice. In light of the brutal and unprovoked nature of the murders and defendant's numerous other acts of violence, there is no reasonable possibility the broken heart testimony affected the penalty phase verdict. (See *People v. Jones* (2003) 29 Cal.4th 1229, 1264, fn. 11 ["State law error occurring during the penalty phase will be considered prejudicial when there is a *reasonable possibility* such an error affected a verdict."]; see also *Brady*, *supra*, at pp. 577–578 [improperly speculative victim impact testimony that victim's mother, who died six months after the murder, " 'gave up on life,' " was not prejudicial].)

Lastly, defendant takes issue with an unsolicited response during the cross-examination of Sandra Kennedy, which "interjected" the Bible and her belief defendant would receive the death penalty. When asked whether she believed

58

there was a vendetta against her family that was responsible for her aunt, Debora Kennedy's, murder, Sandra responded, "Now, after hearing all the evidence in court, he's just a cold[-]blooded murderer with no dignity, regard, or respect for anyone, including himself." She then continued: "And, Mr. Parker, I suggest you meet God before you get executed and ask for forgiveness for all of these lives that you took. I've forgiven you. I have. I will never forget. I have compassion for you that God has put in my heart after months and months of prayer, preparing for this trial. [¶] I have prayed for you. I have you on a prayer chain at my church. I'm even prepared to write you from prison if you don't get the death penalty because I want you to know that your eternal life, your spiritual life, weighs in the balance now. And the Bible says that you will be tormented in hell for eternity if you do not accept responsibility for what you've done and ask God on bended knees in humility and brokenness for forgiveness and ask him to cleanse you and prepare you to take you home because I'm quite certain you will get the death penalty. . . ."

There is no error defendant can now raise on appeal with respect to the contested testimony. This evidence came in during cross-examination of a victim impact witness; in other words, it was *defense* evidence. Not only did defendant fail to object or move to strike the testimony, he also declined the court's sua sponte offer to admonish the jury and later expressly stated his nonobjection to this testimony. Indeed, defense counsel used the testimony during penalty phase closing arguments by quoting it at length in arguing in favor of life without the possibility of parole.[17]

---

[17] Defense counsel argued, "That's what she said. And she said it from the heart. And some people didn't like to hear her say that because there wasn't

*(footnote continued on next page)*

## E.     Penalty Phase Closing Argument

Defendant contends the trial court erroneously and prejudicially prohibited defense counsel from arguing to the jury during the penalty phase closing argument his lack of future dangerousness, in other words, that he would not pose a danger if sentenced to life in prison without the possibility of parole. After both sides had rested, the trial court, referring to the defense's cross-examination of the prosecution's rebuttal expert witness, Forensic Psychiatrist Dr. Park Dietz, stated: "Part of that line of questioning . . . touched on what might be classified as future dangerousness. I don't believe either side is permitted to introduce evidence on that subject, let alone comment during the course of your argument. . . . If you feel that the court is in error . . . the time to correct me is now. But . . . I believe the law precludes the parties commenting about future possibilities." Defense counsel asked whether this ruling took "into account the fact that we plan on mentioning the use of the psychotropic drugs that [defendant] is under now? I'm not going to use the word 'danger,' but I think it's imminently [*sic*] apparent to anybody in the room when he is under these drugs he is a lot less a danger to himself and others. I won't use the word 'danger,' but I would be talking about the drugs, and their availability in the state prison system. That's been going on since the beginning of the trial." The judge replied: "You have to expand. . . . I don't want you trying to do indirectly what you cannot do directly. So, I need to know the substance of what you want to say, in that regard." Defense counsel responded: "That he could be continued to be medicated, the same way he is in county jail right now, and the way he was in state prison before he was brought to

---

*(footnote continued from previous page)*

enough hate in it, there wasn't enough real venom in it. There was a thoughtfulness to it."

60

the county jail. But the facilities exist, the medication exists, the doctors exist. And that can come in. I don't see how that could be irrelevant in light of the testimony we've had on that point." The court asked, "Is that the extent?" Defense counsel replied, "Yes."

The next court day, the prosecutor stated he believed both sides were permitted to argue future dangerousness or lack thereof, citing *People v. Davenport* (1995) 11 Cal.4th 1171 (*Davenport*). The court remained skeptical: "*Davenport* is one of the early cases. . . . I would be concerned about relying on *Davenport* holding the day in the future. [¶] And I'm also concerned about why . . . the D.A. even needs to talk about that given the evidence that you have going to the jury. [¶] So I just think that you're skating on thin ice if you get on that topic, and if what you're asking for is guidance about argument, don't get into it." The court then expressed concern "about counsel for defendant because they're the ones that started to touch on this subject, and I don't know whether they did so intentionally, but I want to make sure they don't get into the topic." Defense counsel responded: "My plan is to do exactly what I told you yesterday and you said this was all right. I can discuss psychotropic medication." The court replied, "That's fine," and then added: " I'm not faulting your research or your interpretation. What I'm saying is I think everything I've looked at on that topic is that it's not a given as to what the appellate court would do on that issue, and I see no need for either side to get into this particular subject on this case."

Contrary to the trial court's suggestion, *Davenport* was not addressing an issue of first impression. Rather, at the time of defendant's 1998 trial, *Davenport* had been on the books for three years and articulated a not-so-new proposition: " ' "[W]e have held that argument directed to a defendant's future dangerousness, when based on evidence of the defendant's past conduct rather than expert opinion, is proper . . . ." ' " (*Davenport*, *supra*, 11 Cal.4th at p. 1223, citing

61

*People v. Fierro* (1991) 1 Cal.4th 173, 249 and *People v. Davenport* (1985) 41 Cal.3d 247, 288.) However, the erroneous ruling was clearly harmless because the argument defendant was allegedly barred from making was only slightly different from the argument he actually advanced.

During the penalty phase closing arguments, defense counsel argued as follows: "[T]his man is not the same man he was twenty years ago. You wouldn't be killing the same man. There is no evidence contrary to this that this man was not diagnosed for his own mental illness twenty years ago, no one diagnosed him, no one sedated him, no one medicated him. What happens? [¶] He finally gets arrested after all these horrific crimes, for which I make no excuse, and they eventually diagnose him for his mental illness. Who does that? [¶] The prison authorities can't and [the prosecutor] can't tell you any different, uncontroverted evidence. They put him on antipsychotic/psychotropic medication. They did it. He's been 29 months in the jail waiting for his trial. The jail psychiatric team— and you'll see the records—did the same thing. They medicated him. And when he's medicated, what happens? The violent tendencies are gone. [¶] We even adjusted his medication a couple of times as you heard. Violent tendencies are gone. It's not the same man. [¶] . . . If you decide not to kill him, he's going to go to prison for the rest of his life without the possibility of parole. He's not going anywhere. They're going to medicate him, and he's going to stay there. . . . He's not going anywhere."

Defendant claims he was prejudiced by the trial court's ruling because his "entire penalty phase case was devoted to showing the jury that he was no longer a danger. Yet, all his counsel were permitted to argue was that prison authorities diagnosed appellant's mental illness and put him on antipsychotic/psychotropic medication[,] which made his violent tendencies disappear. They were not permitted to fully develop the theme of their case and make an explicit argument

62

to the jury." The scope of this argument is at most marginally broader than what defense counsel did in fact argue. There is no reasonable possibility the penalty phase verdict would have been different but for the failure of defense counsel to explicitly argue defendant "no longer posed a danger," as opposed to that his "violent tendencies [were] gone."

## F.    Challenges to California's Death Penalty Statute

Defendant raises a number of challenges to the constitutionality of California's death penalty scheme. As he acknowledges, we have previously considered and consistently rejected these contentions. We do so again as follows.

Neither the federal nor the state Constitution requires that the penalty phase jury find beyond a reasonable doubt that aggravating factors outweigh mitigating factors before determining whether or not to impose a death sentence. (E.g., *People v. Blair* (2005) 36 Cal.4th 686, 753; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1255.) The United States Supreme Court's decisions interpreting the Sixth Amendment's jury trial guarantee do not alter these conclusions. (E.g., *People v. Bramit* (2009) 46 Cal.4th 1221, 1250 & fn. 22, citing *Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466.)

"The death penalty is not unconstitutional for failing to impose a specific burden of proof as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (*People v. Howard* (2008) 42 Cal.4th 1000, 1031.) Nor is the court required to instruct jurors that there is no burden of proof in the penalty phase. (E.g., *People v. Mai* (2013) 57 Cal.4th 986, 1057.)

63

The penalty phase jury is not required to unanimously find that a particular set of aggravating circumstances warrants the death penalty, nor is juror unanimity required in the consideration of a defendant's unadjudicated criminal activity. (E.g., *People v. Valdez* (2012) 55 Cal.4th 82, 179 (*Valdez*).)  The decisions interpreting the Sixth Amendment's jury trial guarantee do not alter these conclusions.  (E.g., *People v. Ward* (2005) 36 Cal.4th 186, 221–222.)

CALJIC No. 8.88 as given informed the jury that "[t]o return a judgment of death, each of you must be persuaded that the aggravating factors are so substantial in comparison with the mitigating factors that it warrants death instead of life in prison without parole."  The phrase "so substantial" is not "vague," or "directionless."  (*People v. Russell* (2010) 50 Cal.4th 1228, 1273; accord, *People v. Sanchez* (1995) 12 Cal.4th 1, 81; *People v. Breaux* (1991) 1 Cal.4th 281, 316, fn. 14.)  Nor is it "impermissibly broad."  (*Valdez*, *supra*, 55 Cal.4th at p. 180.) CALJIC No. 8.88 is not unconstitutional for failing to advise the penalty phase jury that (1) "the 'central determination is whether death is the "appropriate" penalty' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1111), (2) if the jury determines the mitigating evidence outweighs the aggravating evidence, it is required to return a verdict of life in prison (e.g., *People v. Page* (2008) 44 Cal.4th 1, 57), or (3) it can return a verdict of life in prison if it determines that aggravation outweigh mitigation (e.g., *People v. Jackson* (1996) 13 Cal.4th 1164, 1243–1244).  The instruction is not defective for failing to tell jurors that defendant bears no burden of proving facts in mitigation (e.g., *People v. Jones* (2013) 57 Cal.4th 899, 980) or that unanimity regarding mitigating circumstances is not required (e.g., *McCurdy*, *supra*, at p. 1111).  There is no requirement jurors be instructed there is a " ' "presumption of life" ' " or that they should presume life imprisonment without the possibility of parole is the appropriate sentence.

(*People v. Combs* (2004) 34 Cal.4th 821, 868; *People v. Arias* (1996) 13 Cal.4th 92, 190.)

The use of adjectives such as "extreme" in section 190.3, factors (d) and (g), or "substantial" in section 190.3, factor (g) (see also CALJIC No. 8.85), do not serve as improper barriers to the consideration of mitigating evidence. (E.g., *Cruz*, *supra*, 44 Cal.4th at p. 681.) The trial court has no obligation to delete inapplicable mitigating factors from CALJIC No. 8.85. (E.g., *People v. Cook* (2006) 39 Cal.4th 566, 618.)

There is no constitutional requirement that California's death penalty sentencing scheme provide for intercase proportionality review. (*People v. Moon* (2005) 37 Cal.4th 1, 48.)

Because capital defendants are not similarly situated to noncapital defendants, California law does not deny equal protection by providing certain procedural rights—such as a unanimity requirement for true findings on enhancement allegations, a requirement that such findings be made beyond a reasonable doubt, and a requirement that the sentencer provide written reasons justifying the sentence—to noncapital defendants but not to capital defendants. (E.g., *Cruz*, *supra*, 44 Cal.4th at p. 681.)

We again reject the argument that this state uses capital punishment " 'as *regular punishment*,' " thereby offending international norms of humanity and decency and violating the Eighth and Fourteenth Amendments of the United States Constitution. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43–44.)

### G.    Cumulative Prejudice

Defendant claims that even if the errors he has asserted were individually harmless, they were cumulatively prejudicial. We found error with respect to the trial court's restriction of defendant's lack of future dangerousness argument

during the penalty phase, and a possible error with respect to the admission of the broken heart victim impact evidence, but concluded they were both harmless. There are no additional errors to cumulate and no possible cumulative prejudice that could have denied defendant a fundamentally fair trial.

## III.   DISPOSITION

For the foregoing reasons, the judgment is affirmed in its entirety.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**KRUGER, J.**

**CONCURRING OPINION BY CANTIL-SAKAUYE, C. J.**

I join the majority opinion in full. I write separately to observe that the People have not requested that we use this opportunity to reconsider our decision in *People v. Smith* (1983) 34 Cal.3d 251 (*Smith*). In *Smith*, this court held that the Right to Truth-in-Evidence provision of Proposition 8, a 1982 ballot initiative (see now Cal. Const., art. I, § 28, subd. (f)(2)), curtailing application of the exclusionary rule in criminal proceedings, does not apply in cases where the tried crimes occurred before the proposition's effective date of June 9, 1982. (*Smith*, at p. 258.)

Were we to revisit *Smith*, *supra*, 34 Cal.3d 251, it is not clear that the decision would stand. The *Smith* court premised its holding partially on concerns that application of the Right to Truth-in-Evidence provision in cases where the charged crimes occurred before Proposition 8's effective date could violate the ex post facto clauses of the federal and state Constitutions. (*Smith*, at p. 259; see U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) However, the United States Supreme Court's subsequent clarification of what constitutes an ex post facto law may have alleviated these concerns.

Specifically, the high court has indicated that changes in the law that affect only the rules governing the admissibility of evidence do not implicate the federal or state ex post facto clauses. There are four categories of ex post facto laws: "1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.

1

4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." (*Calder v. Bull* (1798) 3 Dall. 386, 390, italics omitted.) In *Carmell v. Texas* (2000) 529 U.S. 513, the court determined that the fourth *Calder* category of ex post facto laws was concerned with changes in legal rules that "govern[] the sufficiency of [the] facts for meeting the burden of proof," and not with alterations to rules that "merely 'regulat[e] . . . the mode in which the facts constituting guilt may be placed before the jury.' " (*Id.*, at p. 545.) The court observed that, for purposes of the ex post facto clause, "[t]he issue of the admissibility of evidence is simply different from the question whether the properly admitted evidence is sufficient to convict the defendant." (*Carmell*, at p. 546.) Thus, under *Carmell*, "changes in the law that do no more than alter the rules for admissible evidence" do not implicate the federal or state ex post facto clauses. (*People v. Flores* (2009) 176 Cal.App.4th 1171, 1178; see also *In re Vicks* (2013) 56 Cal.4th 274, 287 [observing that the ex post facto clause found at article I, section 9 of the California Constitution "provides the same protections and is analyzed in the same manner as the federal provision"].)

Although a definitive resolution of this question is unnecessary here, it is arguable that the application of the Right to Truth-in-Evidence provision in cases such as this one would not run afoul of ex post facto principles. Nevertheless, because *Smith* is still binding precedent and defendant's charged crimes took place in 1978 and 1979, the majority opinion and Justice Liu's concurring and dissenting opinion must apply our pre-Proposition 8 case law to defendant's claim of error under *Miranda v. Arizona* (1966) 384 U.S. 436. As the majority opinion determines, defendant's claim of *Miranda* error fails even though our pre-Proposition 8 case law guides that decision. (Maj. opn., *ante*, at pp. 38-49.) But crimes that preceded Proposition 8 continue to be investigated and tried (see, e.g., *People v. Cordova* (2015) 62 Cal.4th 104, 109 [describing a 2002 "cold hit" of DNA evidence that connected the defendant with a 1979 murder]; *People v. Nelson*

2

(2008) 43 Cal.4th 1242, 1248-1249 [relating the 2001 and 2002 investigation of a murder that occurred in 1976]; *People v. Shamblin* (2015) 236 Cal.App.4th 1, 5-6 [discussing an investigation, culminating in 2011, of a 1980 murder].)  The outcome in a future case may be affected by whether this court or a lower tribunal applies the law as it stood prior to Proposition 8, or principles that have developed since the effective date of that measure.

**CANTIL-SAKAUYE, C. J.**

**CONCURRING AND DISSENTING OPINION BY LIU, J.**

I respectfully disagree with today's holding that the police did not violate defendant Gerald Parker's right to remain silent under *Miranda v. Arizona* (1966) 384 U.S. 436. California law, as it existed in the late 1970s and early 1980s when Parker committed the murders for which he was convicted, required the prosecution to prove beyond a reasonable doubt the voluntariness of a defendant's confession. The Attorney General has not carried that burden here. But because the error was harmless with respect to all the murder convictions except one, I join the court in affirming Parker's death sentence.

As the court explains (maj. opn., *ante*, at p. 39 & fn. 13), the law governing Parker's confession is the law this court articulated before the "Right to Truth-in-Evidence" took effect in 1982. (Cal. Const., art. I, § 28, subd. (f)(2).) Our doctrine encompassed three principles that are relevant here.

First, the prosecution must prove the voluntariness of a confession beyond a reasonable doubt. (*People v. Jimenez* (1978) 21 Cal.3d 595, 608.)

Second, "[a]ny words or conduct which 'reasonably appears inconsistent with a present willingness on the part of the suspect to discuss his case freely and completely with police *at that time* [fn. omitted]' [citation] must be held to amount to an invocation of the Fifth Amendment privilege." (*People v. Burton* (1971) 6 Cal.3d 375, 382 (*Burton*).) "To strictly limit the manner in which a suspect may assert the privilege, or to demand that it be invoked with unmistakable clarity

1

(resolving any ambiguity against the defendant) would subvert *Miranda*'s prophylactic intent." (*People v. Randall* (1970) 1 Cal.3d 948, 955.)

Third, "after a defendant has once demonstrated he does not wish to waive his privilege against self-incrimination, the police cannot lawfully subject him to a new round of interrogation even if they repeat the *Miranda* warnings: 'By his refusal to waive his constitutional rights initially, defendant indicated that he intended to assert his rights — the privilege had been *once invoked* — and all further attempts at police interrogation should have ceased.' " (*People v. Pettingill* (1978) 21 Cal.3d 231, 238 (*Pettingill*), quoting *People v. Fioritto* (1968) 68 Cal.2d 714, 719 (*Fioritto*).) The reason for the *Fioritto* rule " 'is to prevent the police from wearing down a prisoner's resistance by repeated pressuring until he finally makes the statement desired in order to get peace.' " (*Pettingill*, at p. 250, fn. 11.) We rejected the approach taken in *Michigan v. Mosley* (1975) 423 U.S. 96, 104, which permits subsequent interrogation after a defendant's initial *Miranda* invocation under some circumstances. (*Pettingill*, at pp. 249–251.)

Importantly, we held in *Pettingill* that it does not matter if the subsequent attempt at interrogation is made by a different law enforcement agency. In that case, a burglary suspect in Eureka was found with some items that appeared to come from Santa Barbara, leading to notification of the Santa Barbara police. The Eureka police interrogated him several times despite his statement that he did not wish to talk. Three days later, he was questioned by a Santa Barbara detective and finally confessed. In his testimony at the motion to suppress, he explained: " 'I just wanted to get them off my back, and I figured the only way I could is to say something, and when the last officer talked to me, you know, for a pretty long time, I figured the only way I could was to go ahead and say something.' " (*Pettingill*, *supra*, 21 Cal.3d at p. 236.) In addition to noting that the record did not show Pettingill was willing to speak to one police department but not another,

2

we rested our holding on the "broader grounds" that "the large majority of suspects . . . see the uniform only as a symbol of police authority, . . . neither know nor care about the precise jurisdictional competence of their interrogators, and . . . do not want to talk to any of them. Little would remain of the *Fioritto* rule if it could be evaded simply by sending in an officer from a different police or sheriff's department every time a suspect asserts his right to remain silent, or by changing the subject of the questioning from one of the crimes under investigation to another." (*Id.* at p. 245.)

In this case, Costa Mesa Police Detectives Giesler and Redmond interrogated Parker. Detective Giesler asked, "Why don't you tell us what happened?" Parker replied, "The thing is, I will reserve the right to speak at another time, . . . ." When the detectives urged Parker to "speak the truth" and "[g]et the monkey off your back," Parker replied, "Yeah, the day is not today though." Detective Giesler asked, "Why is today not the day?" Parker replied, "I can't take it." When Detective Redmond urged Parker to "get it off your chest," and to explain the reason for his actions, Parker replied, "Yeah, but there's also a reason for wanting to wait too." Parker added, "[L]ike I say, once again, . . . there's I think for me, there's a time, and a place for saying what I have to say, and, in reference to what happened, I, I there's nothing else that I can tell you."

Detective Giesler pressed on: "Gerald, I can guarantee you, they're going to say, Lynda, did he say why? Can you tell me why? Can you try to tell me why? Did you know any of these women?" Parker replied, "Like I say, I think I should wait until later on before . . . ." At that point, Detective Giesler said: "I don't understand what you're saying to me, are you saying, okay Lynda, when I get to Orange County, come and see me? . . . . Are you saying, Lynda, I don't want to talk to you?" Parker replied: "No, no, this, this, I, I just need some time to call upon myself, to bring, to draw up on some strength. . . . To say what I have

3

to say. . . . When they take me down there, yes, you can come back." After Detective Giesler clarified Parker's willingness to talk to her after being transferred from state prison to the Orange County jail in 23 or 24 days, Detective Giesler informed Parker that there was "an investigator from Tustin . . . who wants to talk to you." Parker asked whether "Tustin was the only one here?"

If there is an ambiguity about whether a suspect is invoking the right to remain silent, the police may continue to question him for the limited purpose of determining whether he is invoking the right. (*People v. Box* (2000) 23 Cal.4th 1153, 1194.) At least some of the colloquy between the Costa Mesa detectives and Parker can be characterized as an attempt at clarification. Parker's invocation may have been unclear at first, particularly because he was willing to talk for a while. But by the end of the interrogation, he had made clear — repeatedly — that he no longer wished to talk about the crimes he was accused of committing.

The fact that Parker said he would be willing to speak to Detectives Giesler and Redmond in Orange County in three weeks does not vitiate his invocation of the right to remain silent at the time of the initial interrogation. No doubt some suspects, uncomfortable with irrevocably refusing to speak with police interrogators, will invoke the right to remain silent while leaving open the possibility of talking at some later point. What matters, however, is whether the suspect has made clear he is not *presently* willing to talk to the police. (*Burton*, *supra*, 6 Cal.3d at p. 382; see *People v. Peracchi* (2001) 86 Cal.App.4th 353, 361 [suspect's statements that he did not want to discuss the crime under investigation " 'right now' " "clearly indicat[ed] that he intended to invoke his right to remain silent"].) Once a suspect has said he does not wish to speak at the present time, all questioning — including questioning by a different law enforcement agency — must cease. (*Pettingill*, *supra*, 21 Cal.3d at pp. 245–251.) Here, the Costa Mesa detectives understood by the end of their interrogation that Parker did not wish to

4

talk at the time.  Under *Pettingill*, the subsequent interrogation by the Tustin detective violated Parker's right to remain silent.

In concluding that Parker did not invoke his right to remain silent, today's opinion cites *In re Joe R.* (1980) 27 Cal.3d 496 and *People v. Hayes* (1985) 38 Cal.3d 780.  In *Joe R.*, the suspect participated in the interrogation for 30 to 40 minutes, giving exculpatory answers to questions posed by the officers.  When confronted by adverse evidence, the suspect stated, " 'That's all I have to say.' " (*Joe R.*, at p. 516.)  This court upheld as reasonable the trial court's conclusion that this statement was not an invocation of the right to remain silent but merely an assertion that he was standing by his previous story.  (*Id.* at pp. 513–516.)  Parker, by contrast, conveyed no exculpatory version of events; instead, he repeatedly communicated a present unwillingness to talk about the crimes at all, culminating in termination of the interrogation.  *Hayes* is even farther afield; the suspect there confessed to the crimes, and we refused to interpret his expression of reluctance to go into the details of the crime as an invocation of his *Miranda* rights.  (*Hayes*, at pp. 784–786.)  No similar facts are presented here.

The court further explains that "although defendant made statements suggesting he did not want to talk further with the Costa Mesa detective and investigator, he also indicated a willingness to speak with them in the future, and made no objection when they told him that another detective from Tustin wished to speak with him.  Under these circumstances, even assuming defendant sought to invoke his right to terminate the questioning by Redmond and Giesler at that time, that limited invocation did not bar [the Tustin detective] from interrogating defendant about the Tustin offenses after readvising him of his *Miranda* rights and obtaining a waiver of those rights."  (Maj. opn., *ante*, at p. 48.)

5

However, as in *Pettingill*, nothing in the record supports a conclusion that Parker's refusal to continue talking applied only to the Costa Mesa detectives and did not extend to the Tustin detective. In refusing to talk about the crimes, Parker conveyed a general unwillingness that was not limited to the Costa Mesa murders. There is no reason to infer that his acquiescence to the subsequent interrogation after again being read his *Miranda* rights showed that he differentiated between the Tustin detective and the Costa Mesa detectives. *Pettingill*, which involved similar facts, forecloses any such inference; the defendant there had also been readvised of his *Miranda* rights and had expressly waived those rights before the subsequent interrogation in which he confessed. (*Pettingill*, *supra*, 21 Cal.3d at pp. 236, 245.) The fact that Parker responded to questions about the Debora Green murder during the course of the Tustin detective's interrogation (maj. opn., *ante*, at p. 48) cannot support an inference that Parker wanted to speak to him, but not the Costa Mesa detectives, when he told the Costa Mesa detectives he no longer wanted to talk. (See *Pettingill*, at p. 240 [" 'After the initial assertion of the privilege, the defendant is entitled to be free of police-initiated attempts to interrogate him. Any statements made by a defendant in response to such questioning cannot be characterized as voluntary.' "]; *id.* at p. 242 ["[T]he *Miranda-Fioritto* line of decisions is premised on the perception that 'the setting of in-custody interrogation' of a suspect without counsel is inherently coercive."].) In sum, the record does not show beyond a reasonable doubt that Parker's confession was voluntary.

Although the trial court improperly denied Parker's motion to exclude his incriminating statements, I would nonetheless affirm the death judgment. As the Attorney General correctly argues, except for one victim, Marolyn Carleton, there was compelling DNA evidence that tied Parker to the murders. I would therefore uphold five of the six murder convictions, along with the special circumstances of

6

multiple murder and murder during the commission or attempted commission of rape and burglary.  Further, in light of the aggravating evidence presented at the penalty phase, including the five brutal murders themselves and Parker's violent criminal history, it is clear beyond a reasonable doubt that the absence of the Carleton conviction would not have altered the jury's death verdict.

I join today's opinion except for its treatment of the *Miranda* issue, and with the exception of Parker's conviction for the Carleton murder, I join the court in affirming the judgment.

LIU, J.

I CONCUR:

CUÉLLAR, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Parker
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S076169
**Date Filed:** June 5, 2017
_____

**Court:** Superior
**County:** Orange
**Judge:** Francisco P. Briseño

_____

**Counsel:**

Michael J. Hersek, State Public Defender, and Jeffrey J. Gale, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Annie Featherman Fraser and Holly D. Wilkens, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jeffrey J. Gale
111 Bank Street, #303
Grass Valley, CA  95945-6518
(530) 320-2777

Holly D. Wilkens
Deputy Attorney General
600 West B Street, Suite 1800
San Diego, CA  92101
(619) 738-9031